1997 ND 1

STATE of North Dakota, Plaintiff and Appellant,

v.

Lanny James KENNER, Defendant and Appellee.

STATE of North Dakota, Plaintiff and Appellant,

v.

Shawn DESETH, Defendant and Appellee.

Criminal Nos. 960071 to 960073.

Supreme Court of North Dakota.

Jan. 16, 1997.

whichever is greater." This subsection was enacted in 1993. *See* 1993 N.D. Laws Ch. 324, § 3.

Lonnie W. Olson (argued), State's Attorney, Devils Lake, for Plaintiff and Appellant.

Scott R. Thompson (argued), of Thompson & Thompson, Devils Lake, for Defendant and Appellee Lanny Kenner.

Todd A. Schwarz (on brief), of Frith, Schwarz & Steffan, Devils Lake, for Defendant and Appellee Shawn Deseth.

## OPINION

MARING, Justice.

[¶ 1] The State of North Dakota appeals from an order of dismissal and of suppression of evidence found as a result of a search of Shawn Deseth's car. The State questions the trial court's decision that the investigatory stop was not based on a reasonable and articulable suspicion. We remand to the trial court for further findings.

[¶ 2] On September 8, 1995, Sergeant Ted Rainesalo and Officer James Frank of the Devils Lake Police Department were on patrol in downtown Devils Lake in separate patrol cars. At approximately 10:20 p.m., the following radio traffic was recorded:

1 —Officer # 1 (Rainesalo)

2 —Officer # 2 (Frank)

D —Dispatch

1: Run me a 10–27—Shawn Diseth (sic)

D: Standby.

D: 6—LEC

1: 6—LEC

D: License suspended on Shawn Michael Diseth (sic).

Moments later, the following conversation took place between Rainesalo and Officer Frank:

1: There's a grey Cutlass—westbound on 4th Street, just going in front of the old Penney's there—I believe Shawn is driving that car—I can't get around on it.

2: What—the one with all the rust on it?

1: It's grey—kind of a primer colored—just went past 5th—5th Avenue going west.

2: What—5th Avenue going west?

1: No—it's on 4th Street, but just went by 5th Avenue.

2: I think I've got it here—you're talking about a full size with sun roof—correct?

1: Yeah—10-4.

2: I'm on him. David–Tom–Boy 966. David–Tom–Boy 966. Uh, we're right out in front of Chautauqua right now. I'm going to let him get out of here a little bit before I take him. Is that him?

1: I can't say for sure that that's him driving that car, but I would say that it's his car—probably him.

2: Well, I guess we'll find out here in just a second.

[¶ 3] After this exchange, Frank stopped the car which he believed was the car Rainesalo had identified as possibly driven by Shawn Deseth.

[¶ 4] When Frank stopped the car, Shawn Deseth was identified as the driver. There were two passengers in the car. Frank spotted several beer bottles in the car, and arrested Deseth for minor in possession and driving under suspension. The passengers, also both under 21, were cited and released, and Deseth and the car were transported to the police station. Frank impounded the car and asked Deseth for the key to "get the beer out of the trunk". When Deseth told Frank that the trunk key was lost, Frank had the lock broken and the trunk forcibly opened. Inside the trunk, Frank found several items which he believed were taken during a recent burglary of the Sweetheart bakery. Based upon this finding, Frank obtained a search warrant for Deseth's home and the home and vehicle of one of the passengers, Lanny Kenner.

[¶ 5] Both Deseth and Kenner brought motions to suppress any evidence found in the search of the trunk, and the trial court granted the motions on the grounds that the initial stop of Deseth's car was not based on any reasonable and articulable suspicion held by the police officers.

[¶ 6] The issue on appeal is whether the initial stop of the vehicle driven by Shawn Deseth was based on a reasonable and articulable suspicion.

[¶ 7] Under N.D.C.C. § 29-28-07(5), the State is authorized to bring an appeal from an order granting suppression. "We affirm a trial court's decision on a motion to suppress unless, after resolving conflicting evidence in favor of affirmance, we conclude there is insufficient competent evidence to support the decision, or unless we conclude the decision goes against the manifest weight of the evidence." *State v. Hawley*, 540 N.W.2d 390, 392 (N.D.1995). "Th[is] standard of review recognizes the importance of the trial court's opportunity to observe the witnesses and assess their credibility, and we 'accord great deference to its decision in suppression matters'." *State v. Bjornson*, 531 N.W.2d 315, 317 (N.D.1995) (quoting *State v. Brown*, 509 N.W.2d 69, 71 (N.D. 1993)). "While we defer to the trial court's findings of fact, questions of law are fully reviewable." *Hawley* at 392. "[T]he 'ultimate conclusion' of whether the facts support a reasonable and articulable suspicion is fully reviewable on appeal." *Hawley Id.* (quoting *Salter v. North Dakota Dept. of Transp.*, 505 N.W.2d 111, 112 (N.D.1993)).

I

[¶ 8] The law governing the investigative stops of vehicles is clear. An officer must have a reasonable and articulable suspicion that a motorist has violated or is violating the law in order to legally stop a vehicle. *State v. Miller*, 510 N.W.2d 638 (N.D.1994). "Although we have recognized that the concept of reasonable suspicion is not readily reduced to a neat set of legal rules, it does require more than a 'mere hunch'." *Salter v. North Dakota Dept. of Transp.*, 505 N.W.2d 111, 114 (N.D.1993). "The standard is an objective one, and we take into account inferences and deductions that an investigating officer would make that may elude a layperson." *State v. Smith*, 452 N.W.2d 86, 88 (N.D.1990). "The question is whether a reasonable person in the officer's position would be justified by some objective manifestation

to suspect the defendant was, or was about to be, engaged in unlawful activity." *Id.*

[¶ 9] In the present case, the illegal activity suspected by the officer was that Deseth was driving while his license was under suspension. The trial court based its decision that the officers lacked reasonable and articulable suspicion to stop on the basis that driving under suspension is committed by a person, not a vehicle, and the officers had not identified the person driving the car. We remand to the trial court and base our decision on the following analysis.

[¶ 10] We have upheld motions to suppress evidence because of an invalid stop. These cases have mainly involved vehicle stops based on mere "hunch". *See State v. Brown*, 509 N.W.2d 69 (N.D.1993) [officer observed no traffic violations or vehicle violations]; *Salter v. North Dakota Dept. of Transp.*, 505 N.W.2d 111 (N.D.1993) [car traveling slower than speed limit, weaving slightly within own lane. Stop declared invalid]; *State v. Sarhegyi*, 492 N.W.2d 284 (N.D.1992) [passenger car parked in farm implement dealer's lot. Stop declared invalid]; *State v. Goehring*, 374 N.W.2d 882 (N.D.1985) [random 'safety check' of vehicle declared invalid].

██ [¶ 11] "Where one officer relays a directive or request for action to another officer without relaying the underlying facts and circumstances, the directing officer's knowledge is imputed to the acting officer." *State v. Miller*, 510 N.W.2d 638, 643 (N.D.1994); *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *see also State v. Rodriguez*, 454 N.W.2d 726, 729 n. 2 (N.D. 1990). "Thus, an officer who is unaware of the factual basis for probable cause, may make an arrest upon a directive. The rationale for the *Whiteley* rule is that the arresting officer is entitled to assume that whoever issued the directive had probable cause." *Miller Id.* *The question then becomes whether the directing officer had probable cause. Id.; United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). [Emphasis ours] The same analysis applies in the reasonable-suspicion context. *Miller Id.; see Hensley, supra.*

[¶ 12] Investigatory stops of vehicles have also been upheld where the stopping officer has received tips from other police officers or informants, which were then corroborated by the stopping officer's observations. *See State v. Glaesman*, 545 N.W.2d 178 (N.D. 1996) [officer stopped to help stuck motorist, smelled alcohol]; *City of Wahpeton v. Roles*, 524 N.W.2d 598 (N.D.1994) [informant's tip that car was driving on golf course, officer heard loud engine noise and observed truck rolling through stop sign]; *State v. Miller*, 510 N.W.2d 638 (N.D.1994) [tip from drive-up operator at fast-food restaurant, license plate number verified]; *State v. Nelson*, 488 N.W.2d 600 (N.D.1992) [officer observed intoxicated person enter truck and drive off, reported to other officer]; *North Dakota Dept. of Transp. v. DuPaul*, 487 N.W.2d 593 (N.D.1992) [informant's tip that car struck viaduct and officer observed vehicle weaving in and out of lanes]; *State v. Guthmiller*, 499 N.W.2d 590 (N.D.1993) [informant's tip and officer observed car pausing unusually long at stop sign]; *State v. Bryl*, 477 N.W.2d 814 (N.D.1991) [informant's tip and officer observed truck within two minutes]; *State v. Hornaday*, 477 N.W.2d 245 (N.D.1991) [officer informed that three people parked in shopping center lot were drunk and officer observed occupants drinking a beverage]; *State v. Thordarson*, 440 N.W.2d 510 (N.D. 1989) [unidentified call and observed speeding]; *Wibben v. N.D. State Highway Com'r*, 413 N.W.2d 329 (N.D.1987) [officer verified anonymous tip].

[¶ 13] Other cases have involved the stopping officers' own observations of illegal activity. *See State v. Hawley*, 540 N.W.2d 390 (N.D.1995) [officer observed car parked on off-ramp]; *State v. Graven*, 530 N.W.2d 328 (N.D.1995) [officer observed vehicle swerving in and out of lane]; *Wolf v. N.D. Dept. of Transp.*, 523 N.W.2d 545 (N.D.1994) [officer heard excessively loud engine]; *State v. Smith*, 452 N.W.2d 86 (N.D.1990) [beer bottles around car, suspicion of open-bottle violation]; *State v. Placek*, 386 N.W.2d 36 (N.D. 1986) [rear lights not operating].

[¶ 14] In the present case, we have neither information from another officer nor the arresting officer's own observations or information which provide reasonable and articulable suspicion to stop based on the identification

of Deseth as the driver. Neither Frank nor Rainesalo could identify Deseth as the driver of the car in question or even describe the driver physically. The only witness presented by the State at the suppression hearing was Officer James Frank, the officer who made the stop of Deseth's car. The tape and transcript of the conversation between the officers were received into evidence. Frank testified that he heard Rainesalo radio in a driver's license status check and verify that Deseth's driving privileges were suspended. Frank testified that Rainesalo communicated to him that "he [Rainesalo] thought it was Shawn driving the car." Frank had no independent knowledge that the driver was Deseth.

[¶ 15] During Frank's testimony, he never indicated he saw Shawn Deseth driving the car before he stopped the car. Frank testified that he could not see who was driving, could not tell whether it was a man or a woman driving the car, and could not tell how many people were in the car.

[¶ 16] Because Rainesalo did not testify at the suppression hearing, the only evidence the trial court had to rely on in reaching its decision was the testimony of Frank and the transcript of the recorded conversation between the two officers.

[¶ 17] There was no evidence presented that Rainesalo identified Deseth as the driver of the car or that Rainesalo even saw the driver of the car. We do not know whether Rainesalo had other information that it was Deseth driving, because Rainesalo never testified.

[¶ 18] There was no evidence presented that either officer saw Deseth commit a moving violation, nor was there any evidence that either officer noted any vehicular violation.

■ [¶ 19] The trial court found that there was never an identification that it was Deseth driving. We hold a positive identification of the driver is not required in this case in order to uphold the stop.

## II

[¶ 20] Although the officers were not justified in stopping the car based on an identification of the driver, they could have been justified in the stop if they had a reasonable and articulable suspicion the vehicle in question belonged to Deseth. Our review of the evidence reveals that Frank did not recognize the car on sight. In the radio conversation, Rainesalo could only describe the vehicle by its location, model, and color. Frank had to ask several questions to clarify which car Rainesalo meant. Rainesalo told Frank, "I can't say for sure that that's him driving that car, but I would say that it's his car ... probably him." There was no license plate check run, and there was no evidence that Deseth's vehicle had any distinguishing characteristics to differentiate it from any of the other gray Cutlasses in Devils Lake. Frank testified there are "several gray Cutlasses" driving around Devils Lake, but he "was sure that it was" Deseth's car when he pulled it over. However, Frank gave no independent basis for his opinion. Frank testified that the statement by Rainesalo, "I can't get around on him" was a directive to stop the car. Based on Frank's testimony and the radio transcript, it is clear that Frank relied on the information given to him by Rainesalo to stop the car.

[¶ 21] The issue is thus whether Rainesalo had a reasonable and articulable suspicion that the grey Cutlass observed by him belonged to Deseth. The trial court, however, never made a finding in this regard.

[¶ 22] The State cites cases in which the driver of a vehicle was not identified, but a stop was upheld based on the positive identification of the vehicle. *See State v. Rodriguez*, 454 N.W.2d 726 (N.D.1990) [arrest warrant as to person affiliated with the vehicle]; *Geiger v. Backes*, 444 N.W.2d 692 (N.D.1989) [high crime area, owner's license suspension confirmed with license plate check]. In both these cases, there was suspicious activity which led the officers to run a license plate check in the beginning. In *Rodriguez*, the driver of the car was seen leaving a house which was under investigation for drug related activity; and in *Geiger*, the driver was driving the car slowly through a neighborhood in which there had been recent burglaries at 2:40 a.m. These two cases are significantly distinguishable from the present case in that the officers made observations that

the vehicles were involved in suspicious activity, and then verified who owned the vehicles through a license plate check.

[¶ 23] We remand to the trial court for a finding and conclusion on whether officer Rainesalo had a reasonable and articulable suspicion that the grey Cutlass observed by him belonged to Deseth.

[¶ 24] VANDE WALLE, C.J., and NEUMANN and SANDSTROM, JJ.

MESCHKE, Justice, concurring.

[¶ 25] I concur in nearly all of the well-developed majority opinion by Justice Maring, but I do not believe this case is "significantly distinguishable" from *State v. Rodriguez,* 454 N.W.2d 726 (N.D.1990) or *Geiger v. Backes,* 444 N.W.2d 692 (N.D.1989). Here, similar to *Geiger,* an officer identified Deseth's car, but was not sure who was driving:

I can't say for sure that that's him driving that car, but I would say that it's his car— probably him.

Officer Rainesalo quickly confirmed Deseth's license suspension by radio and communicated his reasonable suspicion to the second officer for an investigative stop.

Whether the facts support a reasonable and articulable suspicion is a fully reviewable question of law.

*State v. Gahner,* 554 N.W.2d 818, 820 (N.D. 1996) (citing *State v. Hawley,* 540 N.W.2d 390, 392 (N.D.1995)). Only a *suspicion* is needed, not a *probability,* to investigate further.

[¶ 26] The trial court only found, "there wasn't any license check on the vehicle to positively identify the vehicle as" Deseth's. But "positively" is more than the suspicion required. As we have often explained, "[w]hile there may be other explanations for the officer's observations, the reasonable and articulable suspicion standard is less stringent than probable cause." *City of Grand Forks v. Zejdlik,* 551 N.W.2d 772, 775 (N.D. 1996). It is unclear to me what further findings would do. Therefore, I would reverse both the suppression order and the

dismissal of these prosecutions and remand for trial.