2002 ND 31

**CITY OF DEVILS LAKE, Plaintiff and Appellant,**

v.

**Darrell LAWRENCE, Defendant and Appellee.**

**No. 20010063.**

Supreme Court of North Dakota.

Feb. 20, 2002.

Daniel Mack Traynor, City Prosecutor, Devils Lake, for plaintiff and appellant; submitted on brief.

Darrell Lawrence (no appearance), pro se, St. Michael.

SANDSTROM, Justice.

[¶ 1]   The City of Devils Lake appealed from orders granting a suppression motion and dismissing a charge of driving under the influence of alcohol against Darrell Lawrence.   We conclude the district court erred in ruling police officers had no reasonable and articulable suspicion of criminal activity to stop Lawrence's vehicle, and

we reverse and remand for further proceedings.

I

[¶ 2]   At 7:13 p.m. on September 3, 2000, Police Officers John Rose and Jason Toso, who were patrolling in separate vehicles, received a dispatch from the Lake Region Law Enforcement Center that there was a "fight that was going to begin" at Pop's Bar in Devils Lake.   Officer Rose was the first to arrive at the scene, and he observed a male standing by the door to the bar and two other males entering a vehicle in the parking lot.   No one else was in the parking lot.   The man standing by the door to the bar was Conrad Houle, a person Officer Rose recognized as having been involved in "[p]ast fight calls."   Houle motioned for Officer Rose to "come over" to him, and then informed Officer Rose he had engaged in a "verbal altercation" with the two men entering the vehicle.   Officer Rose observed nothing indicating a physical fight had taken place.   Officer Rose radioed Officer Toso, who had just entered the parking lot, that the vehicle leaving the parking lot was "involved" and "[w]e need to check this one out."   Officer Rose testified:

Q   Officer Rose, did he indicate that they were involved?   What did he say to you?

A   Um, he pointed—he indicated, ah, he pointed or told me verbally, that they were the ones that he was having this verbal altercation with.   I think he said, like—something like, these are the ones you've got to talk too [sic] or I don't recall exactly.   But he indicated to me that—

(THE COURT: I can't hear you, officer.)

A   He did indicate to me that these—that this was the other party involved in

some type of verbal altercation. Um, either—

(THE COURT: Verbal altercation is that what he said, verbal altercation?)

A Well, I don't believe—he didn't tell me that. But, I was kind of lead [sic] to believe that it was a verbal.

(THE COURT: No, no, what did he tell you to the best of your recollection?)

A I—I don't recall. I think he said, you need to talk to—he pointed at em. That these are the guys.

(THE COURT: Okay, did he indicate—did you—based—based on your understanding—your understanding was that if there was an altercation, it was verbal?)

A Yea.

. . . .

Q Um, when you initially responded to this call, what was the call that you were responding too [sic]?

A I recall it was a um, fight that was about to begin call—kind of call.

Q But it wasn't described as a verbal fight?

A No, it was a—I think—that words are starting to be exchanged, and it looks like they are going to go outside and fight. I think that is what the initial—what we were responding too [sic].

Q Okay, and when you arrived um, had you had the opportunity to conduct any investigation with Mr. Houle outside of the bar up until the point that he pointed to this other vehicle?

A No—no, it was—I got out of my car, the other vehicle was leaving. I indicated—he indicated to me that they were involved. I—I—

Q So, this understanding that it was a verbal altercation came to you through the process of your investigation after the vehicle was stopped?

A Yeah. That's after I had a chance to talk to the RP.

. . . .

(THE COURT: So, what was your understanding of what happened when you told the other officer to stop the vehicle?)

A Um, at that point when I told Officer Toso to stop the vehicle, I was—I really didn't have full understanding of what was going on. I just—

(THE COURT: Okay, it was just that this guy pointed, their [sic] involved, and you don't know what he said, though exactly?)

A No. He indicated to me that this was the other party involved in this possible—beginning of a fight.

(THE COURT: So, even to the best of your knowledge in the police report there was a possibility of a fight beginning? But, there was—you had no information that there was a fight going on?)

A No. I believe it came in as a fight was about to happen, and I didn't find out until—cause it all happened at the same time—

(THE COURT: Sure)

A—he pulled in, and he's indicating these guys are involved, check with them. I'll meet with this guy. We'll see what's going on.

[¶ 3] Officer Toso activated his emergency lights and stopped the vehicle to investigate before it left the parking lot. Officer Toso noticed the driver of the vehicle, Lawrence, had an odor of alcohol and asked him to sit in the back of his patrol car while he questioned the passenger for his side of the story. Lawrence later failed field sobriety tests and was arrested and charged with driving under the influ-

ence of alcohol in violation of Devils Lake Municipal Code § 10.46.030.

[¶ 4] Upon appeal of his municipal court conviction to district court under N.D.C.C. § 40–18–19, Lawrence moved to suppress evidence and dismiss the charge, arguing the officers had no reasonable suspicion that he was involved in any type of criminal activity when Officer Toso stopped Lawrence's vehicle in the bar's parking lot. The district court granted the suppression motion and dismissed the charge with prejudice, reasoning:

When Officer Rose arrived on scene an individual standing in the parking lot of the bar told him, that the defendant's vehicle, which was driving out of the lot, was involved. There was nothing that the police officer saw or heard that would infer or suggest that the defendant was involved in criminal activity. The only reasonable inference that could be drawn from what the police officer heard and observed from dispatch, and the man standing outside the bar, is that one or both of the individuals in the vehicle leaving the parking lot were involved in an argument. Arguing is not a crime. Based on the statement given by the individual in the parking lot, Officer Rose radioed Officer Toso who had just arrived on scene, to stop the defendant's vehicle. Police had no articulated suspicion that Mr. Lawrence or his passenger were involved in or were going to be participating in any criminal activity.

[¶ 5] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06(4). The City's appeal is timely under N.D.R.App.P. 4(b). This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 29–28–07(1).

## II

[¶ 6] The City argues the district court erred in ruling the officers had no articula-ble and reasonable suspicion that Lawrence was involved in any criminal activity to justify the stop of his vehicle.

[¶ 7] When reviewing a district court's ruling on a motion to suppress, we defer to the district court's findings of fact and resolve conflicts in testimony in favor of affirmance. *State v. Haverluk*, 2000 ND 178, ¶ 7, 617 N.W.2d 652. We will affirm a trial court's decision on a motion to suppress if there is sufficient competent evidence capable of supporting the trial court's findings, and if its decision is not contrary to the manifest weight of the evidence. *State v. Heitzmann*, 2001 ND 136, ¶ 8, 632 N.W.2d 1. While we defer to the trial court's findings of fact, questions of law are fully reviewable. *State v. Wanzek*, 1999 ND 163, ¶ 5, 598 N.W.2d 811.

## A

[¶ 8] To stop a moving vehicle for investigative purposes, an officer must have an articulable and reasonable suspicion that a law has been or is being violated. *State v. Gregg*, 2000 ND 154, ¶ 27, 615 N.W.2d 515. Reasonable suspicion for a stop exists when a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity. *State v. Kenner*, 1997 ND 1, ¶ 8, 559 N.W.2d 538. Although the concept of reasonable suspicion is not readily reduced to a neat set of legal rules, we have held reasonable suspicion does require more than a "mere hunch." *State v. Loh*, 2000 ND 188, ¶ 5, 618 N.W.2d 477. In determining whether an investigative stop is valid, we use an objective standard and look to the totality of the circumstances. *Id.* at ¶¶ 9–13; *City of Minot v. Johnson*, 1999 ND 241, ¶ 5, 603 N.W.2d 485. In *City of Fargo v. Ovind*,

1998 ND 69, ¶ 9, 575 N.W.2d 901 (citations omitted), we explained:

> We do not require an officer to isolate single factors which signal a potential violation of the law; but instead, "officers are to assess the situation as it unfolds and, based upon inferences and deductions drawn from their experience and training, make the determination whether all of the circumstances viewed together create a reasonable suspicion of potential criminal activity." When assessing reasonableness, we consider inferences and deductions an investigating officer would make which may elude a layperson.

█ [¶ 9] When, as here, one officer relays a directive or request for action to another officer without relaying the underlying facts and circumstances, the directing officer's knowledge is imputed to the acting officer. *Kenner,* 1997 ND 1, ¶ 11, 559 N.W.2d 538. The ultimate conclusion of whether the facts support a reasonable and articulable suspicion is fully reviewable on appeal. *Gregg,* 2000 ND 154, ¶ 20, 615 N.W.2d 515.

### B

[¶ 10] This case is somewhat similar to *Ovind,* 1998 ND 69, 575 N.W.2d 901. In *Ovind,* police officers responded at 1:45 a.m. to a dispatch reporting a fight at a Taco Bell restaurant. The first officer arrived at the scene between forty-five seconds to one minute after the dispatch and observed two vehicles in the parking lot. One vehicle was backing out of a parking spot, and the other vehicle was exiting the parking lot. The officer called for other officers to stop the car exiting the lot, and he activated his overhead lights and pulled his vehicle behind the car backing out of the parking spot. As the officer approached the vehicle, passengers yelled to him to stop the other car because "they beat us up." *Id.* at ¶ 4. The officer smelled alcohol on the driver and eventually arrested him for driving under the influence of alcohol. The issue on appeal was whether the police officer had reasonable and articulable suspicion to stop the defendant's car.

[¶ 11] We noted corroboration of a tip through observation of illegality may not be practical in cases involving the propriety of a limited investigative stop near the scene of a recent crime:

> In dealing with this issue, some courts, including the Minnesota Supreme Court, have recognized certain situations require facilitating police crime scene investigation. *See State v. Moffatt,* 450 N.W.2d 116 (Minn.1990); *Appelgate [v. Commissioner of Public Safety,* 402 N.W.2d 106, 108 (Minn. 1987) ]; *see generally* 4 Wayne R. LaFave, *Search and Seizure* § 9.4(g) (3d ed.1996). Where police officers are presented with such a situation, the court in *Appelgate* explains, " 'experience has shown that when a victim or witness cannot name the offender his apprehension is unlikely unless he is rather promptly found in the immediate area.' " 402 N.W.2d at 108 (quoting 3 Wayne R. LaFave, *Search and Seizure* § 9.3(d), at 460 (2d ed.1987)). It is therefore necessary for police officers investigating a reported crime scene to have some limited authority to "freeze" the situation. *Id.* Even in circumstances where no one person can be singled out as the probable offender, " 'police [officers] must sometimes be allowed to take some action intermediate to that of arrest and nonseizure activity.' " *Id.* Thus, an investigative stop of a person present at the scene of a recently committed crime may be permissible without violating the Fourth Amendment. Such a stop is especially deemed permissible where only

a limited number of persons are present at the scene of a violent crime. *Wold v. State*, 430 N.W.2d 171, 175 (Minn.1988). We agree with this reasoning.

Professor LaFave, in his discussion of allowing police to "freeze" a situation, certainly does not condone a "dragnet approach," which results "in the temporary seizure of a large number of persons within the range of [a suspect's] possible flight." 4 LaFave, *supra*, § 9.4(g), at 195. But rather in this context, "selective investigative procedures" are necessary "whereby seizures are made only of those as to whom there exists a 'reasonable possibility' " of being involved in the criminal activity. *Id.* LaFave provides the following six factors which, among others, may be considered in determining what facts and circumstances establish this "reasonable possibility" and would justify stopping a motor vehicle or possible offender:

> (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

*Id.*

*Ovind*, 1998 ND 69, ¶¶ 12–13, 575 N.W.2d 901 (footnote omitted). We held "as a matter of law the officer had a particularized and objective basis for suspecting Ovind as having been involved in the reported fight; therefore, the officer was justified in the limited investigative stop of Ovind." *Id.* at ¶ 17.

[¶ 12] The district court in this case found *Ovind* distinguishable because the police in *Ovind* "had an articulated suspicion that a crime had been committed," and in this case, "[a]rguing is not a crime." Although the evidence suggests Officer Rose "really didn't have full understanding of what was going on" when he radioed Officer Toso to stop Lawrence's vehicle upon Houle's direction, we conclude the district court's finding the officers knew there was no physical altercation, but only a "verbal altercation," is supported by sufficient competent evidence, and is not contrary to the manifest weight of the evidence. Nevertheless, the district court's conclusion that arguing cannot violate criminal law is incorrect.

■ [¶ 13] Disorderly conduct is proscribed by N.D.C.C. § 12.1–31–01(1), which provides, in part:

> 1. An individual is guilty of a class B misdemeanor if, with intent to harass, annoy, or alarm another person or in reckless disregard of the fact that another person is harassed, annoyed, or alarmed by the individual's behavior, the individual:
> a. Engages in fighting, or in violent, tumultuous, or threatening behavior;
> b. Makes unreasonable noise;
> c. In a public place, uses abusive or obscene language, ... or makes an obscene gesture;
> d. Obstructs vehicular or pedestrian traffic or the use of a public facility;
> ....
> g. Creates a hazardous, physically offensive, or seriously alarming condition by any act that serves no legitimate purpose; or
> h. Engages in harassing conduct by means of intrusive or unwanted acts,

words, or gestures that are intended to adversely affect the safety, security, or privacy of another person. In *City of Bismarck v. Nassif,* 449 N.W.2d 789, 794–95 (N.D.1989), this Court upheld a disorderly conduct conviction based on the defendant's use of "fighting words" likely to provoke violent reaction where the jury could have reasonably found bystanders in a public place heard the defendant make threatening statements from his private property. In *City of Fargo v. Brennan,* 543 N.W.2d 240, 242–43 (N.D. 1996), this Court further upheld a disorderly conduct conviction based on the defendant's "primarily [] verbal confrontation" with the victim while encroaching and invading her personal zone of privacy and waving his hands. Actions constituting disorderly conduct need be offensive to only one person. *City of Bismarck v. Travis,* 154 N.W.2d 918, 923 (N.D.1967).

[¶ 14] Courts have found lawful temporary detentions of suspects based on law enforcement officers' reasonable and articulable suspicion that the suspects had committed the offense of misdemeanor disorderly conduct. *See, e.g., Kelly v. Bender,* 23 F.3d 1328, 1330 (8th Cir.1994), *abrogated on other grounds, Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (holding where officers heard a man yelling obscenities 100 yards away, asked him to talk to them, and another man appeared and repeated the obscenities, officers had reasonable suspicion of disorderly conduct to justify lawful temporary detention); *People v. Snyder,* 11 Cal. App.4th 389, 13 Cal.Rptr.2d 837, 839 (1992) (holding limited investigative detention of defendant was justified where officer investigated a report that a panhandler at a

drugstore had been creating a disturbance, potentially implicating a violation of the disorderly conduct statute, and defendant matched the description of the suspect); *City of Dodge City v. Hadley,* 262 Kan. 234, 936 P.2d 1347, 1354 (1997) (holding officer had reasonable suspicion of criminal activity necessary to support traffic stop where officer received dispatch that defendant committed disorderly conduct and record check showed parked truck was registered to defendant); *State v. Hayes,* 138 N.H. 410, 640 A.2d 288, 289–90 (1994) (holding traffic stop was legal where eyewitness told officer defendant kicked over parking sign and officer observed defendant yelling and gesturing in parking lot; officer had at least reasonable grounds to suspect defendant of having committed disorderly conduct); *Ste–Marie v. State,* 32 S.W.3d 446, 448–49 (Tex.App.2000) (holding where first officer was informed by second officer that defendant cursed at her young daughter while driving by in vehicle, first officer could have formed reasonable belief that defendant engaged in disorderly conduct to justify stop of defendant's vehicle). *But see Van Patten v. State,* 16 Ark.App. 83, 697 S.W.2d 919, 920–21 (1985) (holding officer who received a radio dispatch about a loud party disturbance at an apartment created by a person who left in brown Jeep did not give officer reasonable suspicion to stop defendant in brown Jeep, because officer had no reason to suspect that a misdemeanor involving personal or property damage had been committed as required by Ark. R.Crim. P. 3.1 to justify temporary detention).[1] An officer's reasonable and articulable suspicion that an individual has committed the offense of disorderly conduct is sufficient

---

1. This Court has ruled N.D.C.C. § 29–29–21, which sets forth specific instances in which a peace officer may stop a person in a public place upon reasonable suspicion, is not appli-

cable to investigatory stops of motor vehicles. *City of Bismarck v. Uhden,* 513 N.W.2d 373, 376 (N.D.1994).

to justify a temporary detention of that individual for investigative purposes.

### C

[¶ 15] In this case, Officers Rose and Toso received a dispatch about a "fight that was going to begin" at a bar. Physical fights normally do not occur spontaneously. A law enforcement officer could reasonably infer and deduce from this dispatch, at the very least, the possibility that someone at the bar had engaged in, or was engaging in, "violent, tumultuous, or threatening behavior" with intent to harass, annoy, or alarm another person within the meaning of N.D.C.C. § 12.1–31–01(1)(a), to necessitate a call for police assistance. When Officer Rose arrived at the bar, Houle immediately informed him the two men leaving in the vehicle were "the ones you've got to talk too [sic]" about their "verbal altercation." Houle's indications to Officer Rose that the altercation was "verbal," rather than physical, did not rule out the possibility that a violation of the disorderly conduct statute had occurred.

[¶ 16] In 4 W. LaFave, *Search and Seizure* § 9.4(g) n. 262 (1996), the author addresses the situation when police officers respond to a call for help and then see one or more persons leaving the area:

> [T]hough it may not be more probable than not that a crime has occurred in such a situation, given the possibility that the call is a prank or is unrelated to criminal activity, it should be permissible to stop those fleeing the area while more specific information is obtained. *Bell v. United States*, 280 F.2d 717 (D.C.Cir.1960). This is so "even though it again was perfectly possible that no one present was guilty of wrong doing, and certain that not *all* of the persons were guilty of the commission of a

crime." *United States v. Bonanno*, 180 F.Supp. 71 (S.D.N.Y.1960). Given the probability of a disorderly conduct violation occurring at the bar and the identification of the alleged perpetrators by a possible victim, the officers in this case had as much, if not more, justification for the investigative stop than was present in *Ovind*.

[¶ 17] We conclude, under the totality of the circumstances, Officers Rose and Toso had a reasonable and articulable suspicion that Lawrence had been involved in unlawful activity, and the officers were justified in stopping his vehicle to freeze the situation for further investigation. The district court erred in granting Lawrence's suppression motion and in dismissing the driving under the influence of alcohol charge against him.

### III

[¶ 18] We reverse the orders and remand for further proceedings.

[¶ 19] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.