2002 ND 203

**STATE of North Dakota, Plaintiff
and Appellee,**

v.

**Jocelyn BOYD, Defendant
and Appellant.**

**No. 20020136.**

Supreme Court of North Dakota.

Dec. 20, 2002.

Cynthia M. Feland, Assistant State's Attorney, Bismarck, ND, for plaintiff and appellee.

Kent M. Morrow, Bismarck, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Jocelyn Boyd appealed a trial court order denying her motion to suppress evidence and the criminal judgment convicting her of possession of marijuana with intent to deliver, possession of a controlled substance with intent to deliver, and possession of drug paraphernalia. We affirm.

I

[¶ 2] On June 21, 2001, Burleigh County Deputy Sheriff Sharlene Schuh was driving east when she observed a vehicle with Texas license plates. She asked dispatch to run a vehicle license plate check, which was her routine practice when encountering out-of-state license plates. She observed three people in the vehicle, and the individual in the back seat appeared to be a woman. When the vehicle turned south, Deputy Schuh did not follow. When she received the report from dispatch, it contained a National Crime Information Center ("NCIC") request to perform a welfare check on the owner of the vehicle, as a "possibly missing and/or endangered" female. Deputy Schuh then requested assistance and located the vehicle turning into a shopping mall parking lot.

[¶ 3] Deputy Schuh "pulled in behind" the vehicle as its three occupants, Benjamin Alvarez, Jocelyn Boyd, and Christopher Defender, exited. Deputy Schuh identified herself, showed her badge, and told Alvarez, Boyd, and Defender to move to the front of the vehicle and place their hands on the hood. They did not comply with Deputy Schuh's requests until another officer arrived. Further investigation revealed Boyd owned the vehicle. During a pat-down search, police found drugs on Alvarez and also learned there were outstanding arrest warrants against him. Police impounded Boyd's vehicle after a drug dog showed a positive "hit" for drugs. Boyd later consented to a vehicle search, and police discovered drugs in the vehicle. Boyd moved to suppress the evidence found in the search of the vehicle. The trial court denied her motion, and Boyd entered a conditional guilty plea.

[¶ 4]   On appeal, Boyd argues the trial court erred in denying her motion to suppress evidence. She asserts the fact the vehicle had out-of-state license plates did not provide the deputy with a reasonable suspicion of unlawful activity. Therefore, Deputy Schuh illegally stopped the vehicle, and all evidence obtained from the illegal stop should be suppressed. Furthermore, Boyd argues the trial court erred in finding Deputy Schuh's stop of the vehicle was justified by the community caretaking exception of the Fourth Amendment.

## II

[¶ 5]   In *State v. Sabinash*, 1998 ND 32, ¶ 8, 574 N.W.2d 827 (citations omitted), we outlined our standard of review for suppression motions:

> The trial court's disposition of a motion to suppress will not be reversed if, after conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence. That standard of review recognizes the importance of the trial court's opportunity to observe the witnesses and assess their credibility, and we "accord great deference to its decision in suppression matters."

## III

[¶ 6]   Courts have identified several permissible types of law enforcement-citizen encounters, including: "(1) arrests, which must be supported by probable cause; (2) '*Terry*' stops, seizures which must be supported by a reasonable and articulable suspicion of criminal activity; and (3) community caretaking encounters, which do not constitute Fourth Amendment seizures." *State v. Halfmann*, 518 N.W.2d 729, 730 (N.D.1994); *see also Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The trial court considered the encounter in this case the third type, finding Deputy Schuh performed a community caretaking function of law enforcement.

### A

[¶ 7]   Law enforcement officers often serve as community caretakers. *Lapp v. N.D. Dep't of Transp.*, 2001 ND 140, ¶ 14, 632 N.W.2d 419 (citing *State v. DeCoteau*, 1999 ND 77, ¶ 19, 592 N.W.2d 579). The United States Supreme Court described community caretaking functions as those "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Community caretaking allows law enforcement-citizen contact, including stops, without an officer's reasonable suspicion of criminal conduct. *State v. Glaesman*, 545 N.W.2d 178, 181 (N.D.1996). For Fourth Amendment purposes, a seizure does not occur when an officer approaches a parked vehicle if the officer questions the occupant in a conversational manner and does not issue orders to the person or demand a response. *State v. Langseth*, 492 N.W.2d 298, 300 (N.D.1992) (citing *Wibben v. N.D. State Highway Comm'r*, 413 N.W.2d 329, 334–35 (N.D. 1987) (VandeWalle, J., concurring)). However, even a casual encounter can become a seizure if a reasonable person would view the officer's actions—if done by another private citizen—as threatening or offensive. *Id.* (citing *Wibben*, at 335). This may occur through an order, a threat, or a weapon display. *Id.* An officer's initial community caretaking encounter also may cause the officer to develop a reasonable and articulable suspicion of unlawful conduct. *Lapp*, at ¶ 14.

[¶ 8]   Our previous cases provide examples of law enforcement officers performing community caretaking functions. *See Lapp v. Dep't of Transp.*, 2001 ND 140, ¶¶ 14–15, 632 N.W.2d 419 (holding an officer's encounter with an individual justified by the officer's community caretaking role when the individual was slumped over the steering wheel of a vehicle with its engine running); *City of Fargo v. Sivertson*, 1997 ND 204, ¶ 10, 571 N.W.2d 137 (determining an officer's initial approach of a driver who failed to proceed around the scene of an accident with the rest of traffic was a caretaking encounter); *City of Grand Forks v. Zejdlik*, 551 N.W.2d 772, 773–75 (N.D.1996) (holding an officer was acting as a community caretaker when he initially approached an individual slumped over the steering wheel of an idling vehicle); *State v. Franklin*, 524 N.W.2d 603, 605 (N.D. 1994) (determining officers' approach of individuals parked at night in motel parking lot and slumped down in their seats was more of a caretaking encounter than a search or seizure); *State v. Halfmann*, 518 N.W.2d 729, 730–31 (N.D.1994) (holding an officer acted in a caretaking capacity when he approached a driver after she drove to the shoulder of a gravel road and stopped her vehicle).

[¶ 9]   A review of our case law also reveals situations where law enforcement officers did not act as community caretakers. *See State v. Keilen*, 2002 ND 133, ¶ 19, 649 N.W.2d 224 (holding the community caretaking exception did not apply to an apartment search when officers arrived and did not see a disturbance or anyone in need of assistance); *City of Jamestown v. Jerome*, 2002 ND 34, ¶ 8, 639 N.W.2d 478 (determining an officer did not act as a community caretaker because his purpose in talking with the defendant was to investigate a possible legal violation); *State v. DeCoteau*, 1999 ND 77, ¶ 21, 592 N.W.2d 579 (holding officers had no community caretaking role to fill when they arrived at a home, saw no disturbance, and were told by the homeowner she did not need or request their assistance); *State v. Hawley*, 540 N.W.2d 390, 392 (N.D.1995) (declining to address community caretaking because the officer had a reasonable and articulable suspicion of a parking violation); *State v. Brown*, 509 N.W.2d 69, 71–72 (N.D.1993) (holding an officer's vehicular stop was made to determine if driver was intoxicated, not for the community caretaking purpose of rendering assistance); *State v. Sarhegyi*, 492 N.W.2d 284, 285–86 (N.D. 1992) (determining an officer's stop of a lone vehicle parked in a farm implement dealer's lot, which attempted to leave when he approached, was not community caretaking); *State v. Langseth*, 492 N.W.2d 298, 301 (N.D.1992) (concluding the community caretaking exception did not apply when an officer pursued the defendant while flashing the patrol car's warning lights).

[¶ 10]   The present case further illustrates the inapplicability of the community caretaker exception.   In this case, Deputy Schuh "pulled in behind" Boyd and her companions, blocking their vehicle's rear exit.   Deputy Schuh did not converse with them in a casual manner;   she ordered them to go to the front of their vehicle and put their hands on the hood.   By issuing orders and demanding compliance, Deputy Schuh removed herself from the scope of acceptable actions for officers acting as community caretakers. *See State v. Langseth*, 492 N.W.2d 298, 300 (N.D.1992); *Wibben v. N.D. State Highway Comm'r*, 413 N.W.2d 329, 334–35 (N.D.1987) (VandeWalle, J., concurring).   Therefore, we conclude the trial court erred in finding Deputy Schuh acted in a community caretaker role.

B

[¶ 11]   Although   Deputy Schuh's actions do not amount to commu-

nity caretaking, because we apply an objective standard to the actions of the officer we next examine whether her actions were supported by reasonable and articulable suspicion of criminal activity. *See State v. Hawley,* 540 N.W.2d 390, 392–93 (N.D.1995) ("[T]he reasonable-and-articulable-suspicion standard is objective, and it does not hinge upon the subjective beliefs of the arresting officer."). If so, her actions fall within another law enforcement-citizen encounter. *See State v. Halfmann,* 518 N.W.2d 729, 730 (N.D.1994) (identifying three tiers of law enforcement-citizen contact). We conclude, viewing the circumstances as a whole, Deputy Schuh had sufficient information to form a reasonable and articulable suspicion of criminal activity.

■■■■ [¶ 12] We begin our reasonable and articulable suspicion analysis with the premise an individual does not have a privacy right in his or her license plate. *See United States v. Sparks,* 37 Fed. Appx. 826, 829 (8th Cir.2002) (citing *United States v. Walraven,* 892 F.2d 972, 974 (10th Cir.1989)); *cf. State v. Rodriguez,* 454 N.W.2d 726, 728–30 (N.D.1990) (concluding officers' request for a registration check and subsequent reliance on the resulting NCIC report justified an investigatory stop of a vehicle); *Geiger v. Backes,* 444 N.W.2d 692, 693–94 (N.D.1989) (upholding a stop when a vehicle registration check showed the owner's license was suspended, and the vehicle was being driven slowly in an area where numerous thefts had occurred). In *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), the United States Supreme Court stated:

> One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capaci-

ty for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.

Because an officer's check of a license plate does not implicate an individual's Fourth Amendment rights, Deputy Schuh did not need a reasonable suspicion of criminal activity to initially check Boyd's license plate.

■■■■ [¶ 13] In the context of law enforcement-citizen contacts, a "Terry" stop, or investigative stop, temporarily restrains an individual's freedom, which results in a Fourth Amendment seizure. *State v. Glaesman,* 545 N.W.2d 178, 182 (N.D.1996) (citing *State v. Halfmann,* 518 N.W.2d 729, 730 (N.D.1994)). Within the meaning of the Fourth Amendment, a seizure occurs whenever an officer stops an individual and restrains his freedom. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "An investigative stop must be 'justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.' This protects the citizen's Fourth Amendment right to be free of unreasonable searches and seizures." *Glaesman,* at 182 (citations omitted).

■■■■ [¶ 14] In *State v. Sarhegyi,* 492 N.W.2d 284, 286 (N.D.1992), we explained:

> *Terry* requires a dual inquiry into the reasonableness of an investigatory stop. The reviewing court must (1) determine whether the facts warranted the intrusion of the individual's Fourth Amendment rights, and if so, (2) determine whether the scope of the intrusion was reasonably related to the circumstances which justified the interference in the first place.

To justify the intrusion on an individual's Fourth Amendment rights, an officer must have an articulable and reasonable suspi-

cion that a law has been or is being violated. *State v. Lykken*, 406 N.W.2d 664, 666 (N.D.1987). We use an objective standard: would a reasonable person in the officer's position be justified by some objective evidence in believing the defendant was, or was about to be, engaged in unlawful activity? *State v. Indvik*, 382 N.W.2d 623, 627 (N.D.1986) (citing *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

[¶ 15] To determine whether an officer has a reasonable and articulable suspicion, we examine the information known to the officer at the time of the stop. *State v. Robertsdahl*, 512 N.W.2d 427, 428 (N.D.1994) (citing *State v. Miller*, 510 N.W.2d 638 (N.D.1994)). The reasonable-and-articulable-suspicion standard requires the officer justify the stop "with more than just a vague 'hunch' or other non-objective facts; and ... the articulable facts must produce, by *reasonable* inference, a reasonable suspicion of unlawful conduct." *Bryl v. Backes*, 477 N.W.2d 809, 811 n. 2 (N.D.1991) (quoting *State v. VandeHoven*, 388 N.W.2d 857, 858 n. 1 (N.D. 1986)). In determining reasonableness, we recognize an investigating officer may draw inferences and make deductions which would elude a layperson. *City of Fargo v. Ovind*, 1998 ND 69, ¶ 9, 575 N.W.2d 901 (citing *State v. Kenner*, 1997 ND 1, ¶ 8, 559 N.W.2d 538).

[¶ 16] An officer can use information received from other persons along with his or her personal observations to form the factual basis needed for a legal investigatory stop. *City of Minot v. Nelson*, 462 N.W.2d 460, 462 (N.D.1990) (citing *State v. Lykken*, 406 N.W.2d 664, 666 (N.D.1987)); *see also Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). We consider the collective information of law enforcement personnel, known by or transmitted to the stopping officer, to determine whether a stop is reasonable under the Fourth Amendment. *State v. Nelson*, 488 N.W.2d 600, 602 (N.D.1992) (citing *State v. Rodriguez*, 454 N.W.2d 726, 729 (N.D.1990)). This Court has upheld investigatory stops of vehicles when the stopping officer received a tip from other officers or informants and the officer corroborated the tip with personal observations. *State v. Kenner*, 1997 ND 1, ¶ 12, 559 N.W.2d 538.

[¶ 17] In this case, after Deputy Schuh asked dispatch to check the out-of-state vehicle's license plate, she received the NCIC report asking her to perform a welfare check "on a female who owned the car whom [sic] is possibly missing and/or endangered." From her earlier observations, Deputy Schuh saw three occupants in the vehicle and determined the occupant in the back seat was a woman. Deputy Schuh did not know whether the woman she saw or another woman, possibly in the vehicle's trunk, was in danger. In *Geiger v. Backes*, 444 N.W.2d 692, 693 (N.D.1989), we noted law enforcement officers do not have to analyze the individual factors of a case in a vacuum. They also are not required

> to point to a single factor which, standing alone, signals a potential violation of the law. Rather, officers are to assess the situation as it unfolds and, based upon inferences and deductions drawn from their experience and training, make the determination whether all of the circumstances viewed together create a reasonable suspicion of potential criminal activity.

*Id.* Thus, relying on the NCIC report and her own observations, Deputy Schuh formed a reasonable and articulable suspicion that a crime had been or was about to be committed.

[¶ 18] Furthermore, we conclude Deputy Schuh acted reasonably under the cir-

cumstances, after she formed a reasonable and articulable suspicion of unlawful conduct. In analyzing the reasonableness of an investigative stop, we consider "whether the state's interest in investigating the officer's reasonable suspicion outweighs the person's Fourth Amendment interests." *See Wibben v. N.D. State Highway Comm'r,* 413 N.W.2d 329, 332 (N.D.1987) (citing *United States v. Hensley,* 469 U.S. 221, 228–29, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)) (recognizing the important state interest of protecting the public from drunk drivers "outweigh[s] the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes"). This Court must weigh the public interest involved against the individual's right to be free from arbitrary intrusions by law enforcement officers. *State v. Mertz,* 362 N.W.2d 410, 412 (N.D.1985) (citing *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).

[¶ 19] Deputy Schuh, the lone officer on the scene, asked Boyd and her two companions to move to the front of the vehicle and place their hands on the hood. Deputy Schuh acted reasonably, given the uncertain nature of the situation and the potential dangers involved. When we balance the state interest of investigating the report of a "possibly missing and/or endangered" female against Boyd's Fourth Amendment rights, we conclude investigating whether an individual had been harmed or was in danger outweighed the intrusion on Boyd's privacy rights.

## IV

[¶ 20] Because the circumstances presented here, viewed as a whole, gave rise to a reasonable and articulable suspicion of a potential violation of the law, we affirm the order denying the suppression and the judgment of conviction.

[¶ 21] DALE V. SANDSTROM, WILLIAM A. NEUMANN, and MARY MUEHLEN MARING, JJ., concur.

KAPSNER, Justice, concurring.

[¶ 22] I concur with the majority opinion which concludes the NCIC report and Deputy Schuh's personal observations created a reasonable and articulable suspicion to justify an investigatory stop. Under the line of cases permitting pat-down searches of individuals for officer safety and the right to search a vehicle incident to the driver's arrest, I am compelled to concur in the result. I write separately to note the NCIC database which, in part, justified the investigatory stop in this case is limited to include certain persons who are reported missing under specified circumstances. The investigation concerning the NCIC missing person report is to be only as intrusive as necessary to accomplish its purpose. Otherwise we risk the possibility that any NCIC missing person report could be used as a pretext to investigate and search for evidence of other crimes.

[¶ 23] The NCIC database is authorized by 28 U.S.C. § 534. This section directs the Attorney General or officials appointed by the Attorney General to "acquire, collect, classify, and preserve any information which would assist in the location of any missing person ... and provide confirmation as to any entry for such a person to the parent, legal guardian, or next of kin of that person[.]"

[¶ 24] Not every person reported as missing is to be included in the NCIC database. The NCIC has set forth specific criteria for each category of individuals covered in the database, which must be met before an individual is listed in the database. The criteria, relevant to this

case, for listing a person in the database as "missing" require a person to be missing under circumstances indicating "the disappearance was not voluntary" or the "person's physical safety may be in danger." Privacy Act of 1974; Modified System of Records, 60 Fed.Reg. 19774, 19775 (April 20, 1995).

[¶ 25] Deputy Schuh was entitled to rely on the NCIC report indicating Boyd may be "possibly missing and/or endangered." *See State v. Grimes,* 982 P.2d 1037, 1039–40 (Mont.1999) (concluding the NCIC report indicating the registered owner of the vehicle was "missing, and possibly endangered" could serve as the basis for a particularized suspicion to stop the vehicle). The scope of the investigatory stop, however, is limited to a standard of reasonableness which "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

[¶ 26] Under the specific circumstances of this case, I concur with the majority opinion that under an objective standard Deputy Schuh acted reasonably in detaining the occupants of the car to ascertain whether there was a "missing and/or endangered" female. Subsequent events justified the further searches conducted by the officers.

[¶ 27] Carol Ronning Kapsner