2006 ND 152

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Steven Arthur TORKELSEN, Defendant and Appellant.**

**No. 20050250.**

Supreme Court of North Dakota.

July 18, 2006.

**24**

Lisa Beckstrom Gibbens (argued), State's Attorney, Cando, N.D., and Lonnie Olson (on brief), State's Attorney, Devils Lake, N.D., for plaintiff and appellee.

David Duane Dusek (argued), East Grand Forks, MN, and William Robert Hartl (appeared), Rugby, N.D., for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Steven Arthur Torkelsen appealed from a criminal judgment entered on a conditional plea of guilty to class AA felony murder. Because we conclude the initial stop of Torkelsen's vehicle was illegal, we reverse and remand for further proceedings.

I

[¶ 2] On the morning of June 27, 2004, Tom Belzer, a local farmer, discovered a human body burning in a ditch east of Cando in Towner County. Belzer told his hired hand to call emergency personnel. Before law enforcement officers arrived, Torkelsen, a resident of the area, drove up to the scene in a 1980s model red Ford pickup, stopped the vehicle, stepped out onto the road, and asked Belzer if he needed any help. Belzer, who knew who Torkelsen was, told Torkelsen to leave the area, and Torkelsen complied with the request. When Torkelsen left, he did not clearly move to the side of the "narrow gravel road" as emergency vehicles approached his truck on their way to the scene.

[¶ 3] Upon the arrival of Craig Zachmeier, a special agent with the North Dakota Bureau of Criminal Investigation, Belzer informed him of Torkelsen's presence and that Torkelsen did not acknowledge the smoke coming from the body only a few feet away from where Torkelsen had stood. Emergency personnel also informed Zachmeier about Torkelsen's failure to move to the side of the road when they arrived. Captain Kyle Ternes of the Highway Patrol also responded to the scene and directed two troopers to assist with traffic control along Highway 17 east of Cando. Because Torkelsen had been at the scene before law enforcement officers arrived, a "be on the lookout" bulletin was issued for Torkelsen's pickup.

[¶ 4] At approximately 1 p.m., Officer Jason Cartier of the Cando Police Department reported that the Department had received an identified citizen report that Torkelsen was seen driving west of Cando on Highway 17 and was "swerving all over the road." Ternes asked Trooper Frank LaRocque, who was directing traffic on the west side of the crime scene, to head west and find Torkelsen. LaRocque caught up to Torkelsen near Wolford and radioed Ternes. Ternes told LaRocque to follow Torkelsen for a period of time. After LaRocque followed for about three miles, he radioed Ternes and informed him that Torkelsen was not driving erratically or violating any traffic laws and asked for instructions on how to proceed. Ternes told LaRocque to stop Torkelsen and bring him to Cando for questioning, but only after backup officers were in the area. LaRocque was familiar with Torkelsen because Torkelsen had been incarcerated in the Pierce County jail on charges stemming from the violation of a protection

order in early 2004, and Torkelsen had told another officer that "he wouldn't go in peacefully."

[¶ 5] At 1:30 p.m., after other officers had arrived, LaRocque pulled Torkelsen over and instructed him to put his hands where he could see them and slowly exit the vehicle. Torkelsen complied with the orders given and LaRocque told him he was wanted for questioning and would be handcuffed for his own safety. Torkelsen was cooperative and was transported about 28 miles to Cando for questioning. The pickup was left at the scene of the stop. Torkelsen's handcuffs were removed upon his arrival at the Towner County Sheriff's office. Testing revealed Torkelsen was not under the influence of alcohol. Torkelsen was given *Miranda* warnings and questioned. During the interrogation, Torkelsen allegedly consented to a search of his vehicle and trailer, which revealed incriminating evidence. Torkelsen was formally arrested and taken to the Lake Region Correctional Center at 11:30 p.m. that evening.

[¶ 6] The body found burning in the ditch was ultimately identified as that of Rebecca Flaa, and Torkelsen was charged with her murder. Shortly before trial, Torkelsen moved to dismiss or suppress the evidence on Fourth Amendment grounds. The district court denied Torkelsen's motion, and he entered an *Alford* conditional guilty plea under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and N.D.R.Crim.P. 11(a)(2), reserving the right to appeal the district court's denial of his suppression motion. Torkelsen was sentenced to 50 years in prison, with thirty years suspended.

## II

[¶ 7] Torkelsen argues the district court erred in denying his motion to suppress the evidence.

[¶ 8] We apply a deferential standard of review when reviewing a district court decision on a motion to suppress:

> We will defer to a trial court's findings of fact in the disposition of a motion to suppress. Conflicts in testimony will be resolved in favor of affirmance, as we recognize the trial court is in a superior position to assess credibility of witnesses and weigh the evidence. Generally, a trial court's decision to deny a motion to suppress will not be reversed if there is sufficient competent evidence capable of supporting the trial court's findings, and if its decision is not contrary to the manifest weight of the evidence.

*State v. Seglen*, 2005 ND 124, ¶ 5, 700 N.W.2d 702 (quoting *State v. Heitzmann*, 2001 ND 136, ¶ 8, 632 N.W.2d 1). Questions of law are fully reviewable. *Id.*

[¶ 9] The district court ruled the initial stop of Torkelsen's vehicle was valid, not based on the suspicion that he had committed a traffic violation, but because the law enforcement officers had a reasonable and articulable suspicion that Torkelsen had committed a homicide. The court rejected Torkelsen's argument that he was arrested at the time of the initial stop because the officers placed him in handcuffs when they transported him to the sheriff's office in Cando. The court ruled that although this constituted a seizure for Fourth Amendment purposes, the seizure was reasonable given the "safety and security interests involved with [the] serious nature of the crime charged and the fact that [Torkelsen] was seen leaving the place where the body was found." The court pointed out that it "was not asked to decide nor did it decide the issues of consensual search, authorization for a probationary search, and inevitable discovery of the evidence."

[¶ 10] Permissible types of law enforcement-citizen encounters include: (1) arrests, which must be supported by probable cause; (2) *Terry* stops, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), seizures which must be supported by a reasonable and articulable suspicion of criminal activity; and (3) community caretaking encounters, which do not constitute Fourth Amendment seizures. *See State v. Boyd*, 2002 ND 203, ¶ 6, 654 N.W.2d 392; *State v. Halfmann*, 518 N.W.2d 729, 730 (N.D.1994). The State does not argue and the court did not find the first and third types of encounters are applicable in this case. The dispositive issue is whether law enforcement officers had a reasonable and articulable suspicion that Torkelsen had engaged in criminal activity to justify a *Terry* stop.

[¶ 11] Under *Terry*, police may, in appropriate circumstances and in an appropriate manner, detain an individual for investigative purposes when there is no probable cause to make an arrest if a reasonable and articulable suspicion exists that criminal activity is afoot. *Anderson v. Director, N.D. Dept. of Transp.*, 2005 ND 97, ¶ 8, 696 N.W.2d 918. We have said an officer has reasonable and articulable suspicion to stop a vehicle: (1) when the officer relied on an appropriate directive or request for action from another officer; (2) when the officer received tips from police officers or informants, which were then corroborated by the officer's own observations; or (3) when the officer directly observed illegal activity. *Id.*

[¶ 12] LaRocque testified he did not observe Torkelsen engage in any illegal activity, and did not corroborate the tip that Torkelsen had been swerving all over the road. However, when one officer relays a directive or request for action to another officer without relaying the underlying facts and circumstances, the direct-

ing officer's knowledge is imputed to the acting officer. *See State v. Smith*, 2005 ND 21, ¶ 13, 691 N.W.2d 203; *State v. Boline*, 1998 ND 67, ¶ 37, 575 N.W.2d 906; *State v. Miller*, 510 N.W.2d 638, 643 (N.D. 1994). The issue is whether Ternes' direction to pull Torkelsen over was supported by a reasonable and articulable suspicion that Torkelsen had engaged in criminal activity.

[¶ 13] We use an objective standard and view the totality of circumstances to determine whether an investigative stop is valid, and we consider whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity. *Smith*, 2005 ND 21, ¶ 15, 691 N.W.2d 203. In *City of Devils Lake v. Lawrence*, 2002 ND 31, ¶ 8, 639 N.W.2d 466 (quoting *City of Fargo v. Ovind*, 1998 ND 69, ¶ 9, 575 N.W.2d 901(citations omitted)), we explained:

We do not require an officer to isolate single factors which signal a potential violation of the law; but instead, "officers are to assess the situation as it unfolds and, based upon inferences and deductions drawn from their experience and training, make the determination whether all of the circumstances viewed together create a reasonable suspicion of potential criminal activity." When assessing reasonableness, we consider inferences and deductions an investigating officer would make which may elude a layperson.

[¶ 14] In this case, an unidentified woman was found burning in a ditch east of Cando. Before police arrived, Torkelsen drove by, got out of his vehicle, and asked Belzer if he needed any help. Belzer told Torkelsen to leave, and Torkelsen left without commenting on the smoke

coming from the body. Torkelsen did not move his vehicle to the side of the narrow gravel road when emergency vehicles approached as he was leaving. Several hours later he was found traveling west of Cando, but he was not violating any traffic laws. LaRocque knew Torkelsen had a criminal history and "wouldn't go in peacefully." We conclude that under the totality of these circumstances a reasonable officer would not be justified in suspecting that Torkelsen had engaged in criminal activity.

■■■ [¶ 15] Just as mere presence at the scene of a crime is insufficient to support a warrantless search, *see City of Fargo v. Wonder*, 2002 ND 142, ¶ 23, 651 N.W.2d 665, "[i]t is axiomatic that presence at or near the scene of a crime, without more, does not give rise to a reasonable suspicion of criminal activity." *State v. Parker*, 834 P.2d 592, 595 (Utah App.1992). *See also Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct"); *State v. Corum*, 2003 ND 89, ¶ 13, 663 N.W.2d 151 (although an area's reputation for criminal activity is an articulable fact on which a police officer may rely, it cannot solely support a finding of reasonable suspicion); *Batson v. State*, 847 So.2d 1149, 1151 (Fla.App.2003) ("The vehicle's mere presence near the scene is insufficient to give rise to a reasonable suspicion that its occupants were connected to the recent burglary"); *People v. Young*, 202 A.D.2d 957, 610 N.Y.S.2d 417, 418 (1994) ("Because defendant's presence with a number of individuals in a car parked outside the scene of a homicide is as susceptible to an innocent as to a culpable interpretation, that fact did not provide reasonable suspicion that defendant was involved in a crime").

■■■ [¶ 16] Torkelsen was a resident of this rural area. While Torkelsen's stopping at the scene and offering his assistance may have raised the officers' subjective suspicions, reasonable suspicion requires more than a "mere hunch." *Smith*, 2005 ND 21, ¶ 15, 691 N.W.2d 203. Although the State emphasizes Torkelsen's failure to acknowledge the smoldering body, this fact loses much of its significance when considered in conjunction with Belzer's rather unusual directive that Torkelsen simply leave the area. The "narrow gravel road" obviously made Torkelsen's failure to completely yield to emergency vehicles understandable. The State also relies on Torkelsen "heading out of the Cando area," apparently suggesting that Torkelsen was fleeing. *See Heitzmann*, 2001 ND 136, ¶ 19, 632 N.W.2d 1 ("Officers confronted with flight may stop a fugitive and investigate further"). However, LaRocque observed that Torkelsen was not violating any traffic laws, and when officers finally pulled him over several hours after Torkelsen left the scene, he was only 28 miles from Cando. This scenario hardly suggests that Torkelsen was fleeing the area. Torkelsen's criminal history and warning may have justified the officers' use of extra caution when pulling him over and transporting him back to Cando. *See State v. Anderson*, 2006 ND 44, ¶ 24, 710 N.W.2d 392 (officers may use forceable means reasonably necessary to protect their personal safety and maintain the status quo to achieve the purpose of the stop). However, this information is insufficient, in itself, to support a reasonable and articulable suspicion that Torkelsen committed a crime. *See, e.g., Burrell v. McIlroy*, 423 F.3d 1121, 1124 n. 3 (9th Cir.2005) (although prior criminal history cannot alone

establish reasonable suspicion to support detention, it is permissible to consider it as part of the totality of circumstances); *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir.1994) (same).

[¶ 17] We conclude the stop of Torkelsen's vehicle was invalid because the officers lacked reasonable and articulable suspicion that Torkelsen had engaged in criminal activity. Because of our resolution of this issue, it is unnecessary to address the other issues raised.

### III

[¶ 18] We reverse the criminal judgment and remand for further proceedings.

[¶ 19] CAROL RONNING KAPSNER, MARY MUEHLEN MARING, and DANIEL J. CROTHERS, JJ., concur.

SANDSTROM, Justice, dissenting.

[¶ 20] The majority misapplies the law by parsing the facts rather than taking them as a whole. The majority wrongly discards the individual facts merely because there are other conceivable explanations for them. The majority also fails to consider the seriousness of the offense in deciding whether law enforcement had a reasonable suspicion for the stop. I would affirm the decision of the district court, and I therefore respectfully dissent.

### I

[¶ 21] As the majority notes, at ¶ 13, we are to "use an objective standard and view the totality of circumstances to determine whether an investigative stop is valid, and we consider whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity" (citing *State v. Smith*, 2005 ND 21, ¶ 15, 691 N.W.2d 203). *See Terry v. Ohio*, 392 U.S.

1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"). In that context, the severity of the crime, in this case murder, is important to a Fourth Amendment analysis. *State v. Anderson*, 2006 ND 44, ¶ 24, 710 N.W.2d 392. As the United States Supreme Court has said:

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Tennessee v. Garner*, 471 U.S., at 8–9, 105 S.Ct., at 1699–1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

*Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

[¶ 22] Furthermore, law enforcement officers may rely on their common sense when conducting an investigation. *Kappel v. Dir., N.D. Dep't of Transp.*, 1999 ND 213, ¶ 10, 602 N.W.2d 718. "[T]he reasonable suspicion standard does not require an officer . . . to rule out every potential innocent excuse for the behavior in question before stopping a vehicle for investigation." *Id.* The majority, however, takes each individual fact out of this reasonableness analysis. It examines each fact individually and claims each fact is insufficient

in itself to support a reasonable and articulable suspicion.

## A

[¶ 23] The first suspicious fact relevant to this murder investigation was Torkelsen's presence at the site where the victim's body was found.

[¶ 24] After Belzer had discovered the smoking body, Torkelsen pulled up in his pickup. They were the only two people at the scene at the time. The record reflects that when Torkelsen stopped, he did not acknowledge the presence of the smoldering body in any way. The majority discounts Torkelsen's presence by arguing, at ¶ 15, "Just as mere presence at the scene of a crime is insufficient to support a warrantless search, see *City of Fargo v. Wonder*, 2002 ND 142, ¶ 23, 651 N.W.2d 665, '[i]t is axiomatic that presence at or near the scene of a crime, without more, does not give rise to a reasonable suspicion of criminal activity.'" While "presence at or near the scene of a crime, *without more*, does not give rise to a reasonable suspicion of criminal activity," *State v. Parker*, 834 P.2d 592, 595 (Utah Ct.App.1992) (emphasis added), the officers in this case had more on which to rely. Furthermore, most of the cases the majority cites are factually distinct from the remote encounter on a gravel road in this case. Those cases involved crime scenes in populated areas, where the presence of other people would be far more likely. *See Brown v. Texas*, 443 U.S. 47, 49, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ("The area of El Paso where appellant was stopped has a high incidence of drug traffic"); *Batson v. State*, 847 So.2d 1149, 1150 (Fla.App.2003) ("he responded to a call regarding a burglary at 5712 Guava Street.... The burglarized home is two blocks from the end of the street."); *People v. Young*, 202 A.D.2d 957, 610 N.Y.S.2d 417, 418 (1994) ("The investigator testified that he requested that defendant be stopped and brought to headquarters based on a reliable informant's statement that defendant and a number of other men had been sitting in a parked car outside a building where a homicide occurred."); *Parker*, at 592 ("three garages in and around a West Jordan subdivision in Salt Lake County were burglarized"). This case involves a crime scene in a rural area where Torkelsen's almost immediate arrival after the body was discovered is far more suspicious than the presence of the defendants would have been in the cited cases.

## B

[¶ 25] The second suspicious fact was Torkelsen's lack of reaction upon seeing the burning body.

[¶ 26] The majority claims "this fact loses much of its significance when considered in conjunction with Belzer's rather unusual directive that Torkelsen simply leave the area." *Supra* at ¶ 16. The majority stops here, however, never explaining why Torkelsen's reaction is insignificant or what Belzer's directive has to do with the officers' suspicion of Torkelsen. The majority also argues, at ¶ 16, that Torkelsen's presence raised only the officers' subjective suspicions, but Torkelsen's presence and reaction were odd enough that Belzer reported them to law enforcement. Apparently, Torkelsen's presence and reaction were suspicious not only to the officers but also to Belzer. The reasonable inference drawn from Torkelsen's lack of reaction is that he was not surprised to see the body and possibly had information regarding why the body was there. In any event, Torkelsen did not act as a reasonable person likely would when coming upon a burnt body for the first time.

## C

[¶ 27] The third suspicious fact was that on meeting emergency vehicles rushing to the scene, Torkelsen failed to pull over and yield the right of way.

[¶ 28] The record reflects that emergency vehicles were responding with their signal lights activated as Torkelsen was leaving the area. Agent Zachmeier testified he was told that when Torkelsen met the vehicles, "he did not yield to the emergency vehicles." The majority, at ¶ 16, excuses Torkelsen's conduct when first meeting the emergency vehicles on the gravel road as "understandable" and treats this fact alone as irrelevant in light of the narrow gravel road on which they traveled. The statute requiring a driver to yield when meeting an emergency vehicle, however, does not provide for an "understandable circumstances" exception or a "narrow gravel road" exception:

> Upon the immediate approach of an authorized emergency vehicle displaying a visible flashing, revolving, or rotating blue, white, or red light, the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection and shall stop and remain in that position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.

N.D.C.C. § 39–10–26(1).

[¶ 29] Torkelsen was required by law to pull as far as he safely could to the side of the road and stop to allow emergency vehicles to pass. In the context of a murder investigation in which Torkelsen was wanted for questioning, the investigating officers could reasonable interpret Torkelsen's conduct as obstructive and aggressive, especially in light of his presence at the scene, lack of reaction to the body, location when law enforcement stopped him, and known history with law enforcement. Torkelsen's failure to yield is relevant in the context of developing a reasonable and articulable suspicion while investigating a murder. The majority erroneously isolates this fact and ignores its relevancy.

## D

[¶ 30] The fourth suspicious circumstance was Torkelsen's leaving the area, with the addition of a reliable citizen report that he was driving wildly.

[¶ 31] Law enforcement officers ultimately located Torkelsen not at his home or near Cando, the community near where the murder occurred, but driving west on North Dakota Highway 17. He was located by law enforcement after a known informant reported erratic driving, and he was finally stopped, after backup had arrived, approximately twenty-eight miles west of Cando. The majority apologetically states, "when officers finally pulled him over several hours after Torkelsen left the scene, he was only 28 miles from Cando. This scenario hardly suggests that Torkelsen was fleeing the area." The majority takes this fact, again, individually out of the context of the investigation. Torkelsen was wanted for questioning, either as a suspect or a witness. He was located twenty-eight miles away, and a known informant reported Torkelsen had been driving erratically. While he may not have been attempting to rapidly flee the area, the circumstances of this murder investigation do not suggest that he was out for a Sunday drive. A reasonable person with the same training and experience as these law enforcement officers would act as the officers in this case did and would stop Torkelsen before he was allowed to travel any further to prevent him from potentially compromising this investigation or from

actually fleeing. While Torkelsen's location *alone* does not suggest rapid flight from the scene of a crime, it does add another relevant fact the officers could rely on.

## E

[¶ 32] The fifth suspicious fact was Torkelsen's criminal history of domestic violence and history threatening violence against others.

[¶ 33] The record reflects that Torkelsen had a criminal history of violating a protection order. Torkelsen had also threatened law enforcement, saying "he wouldn't go peacefully." The majority discounts Torkelsen's criminal history and "warnings" to law enforcement as "insufficient, *in itself,* to support a reasonable and articulable suspicion...." *Supra* at ¶ 16 (emphasis added). By examining this fact by itself, the majority again takes a fact out of the context of a totality-of-the-circumstances analysis. His criminal history and threats towards law enforcement were two more facts the officers could consider. In the context of this murder investigation, the officers were allowed to consider Torkelsen's criminal history, threat, location when stopped, failure to yield to emergency vehicles, presence at the crime scene, and utter lack of reaction upon seeing the burnt body.

## F

[¶ 34] The sixth factor is the seriousness of the crime in evaluating the reasonableness of the officer's action.

[¶ 35] The severity of this crime cannot be disputed. As the United States Supreme Court has said, the test of reasonableness under the Fourth Amendment includes consideration of the severity of the crime at issue, and flight to evade arrest. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

[¶ 36] Torkelsen was not immediately arrested but was wanted for questioning. Although the officers had not observed Torkelsen committing any illegal acts, all facts known to the officers led them to believe that Torkelsen could have information relevant to the homicide investigation. The officers acted as any reasonable person in the officers' position would, and therefore they had a reasonable and articulable suspicion to stop Torkelsen's vehicle.

## II

[¶ 37] Torkelsen was seen at the crime scene shortly after an apparent homicide. He did not seem surprised by the sight of a burning body. He had a known history of violence and threatened violence. He failed to yield to approaching emergency vehicles. He was leaving the community where the crime had apparently been committed under circumstances that suggested flight. These factors taken together provided the officers with a reasonable suspicion to stop Torkelsen for questioning about an apparent homicide. I would affirm.

[¶ 38]   Dale V. Sandstrom