2008 ND 141

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Steven Arthur TORKELSEN, Defendant and Appellant.**

**No. 20070140.**

Supreme Court of North Dakota.

July 21, 2008.

Lonnie Olson (argued), Ramsey County State's Attorney, Devils Lake, ND, and Lisa Beckstrom Gibbens (appeared), Towner County State's Attorney, Cando, ND, for plaintiff and appellee.

Daniel Eric Gast (argued) and Ross Wheeler Brandborg (on brief), Fargo, ND, for defendant and appellant.

CROTHERS, Justice.

[¶ 1] Steven Torkelsen appeals from a criminal judgment after a jury found him guilty of murdering Rebecca Flaa. We affirm, concluding the district court did not err in denying Torkelsen's motion to suppress evidence seized, and Torkelsen was not denied the right to represent himself.

I

[¶ 2] At approximately 9:00 a.m., on June 27, 2004, Tom Belzer, a local farmer, discovered a human body burning in a ditch east of Cando. Belzer told one of his employees to call emergency personnel. Before law enforcement officers arrived, Torkelsen drove up to the scene in his pickup, stepped out onto the road, and asked Belzer if he needed any help. Torkelsen was smoking a cigarette at the time, and a cigarette butt containing Torkelsen's DNA was later found on the gravel road above the body. Belzer told Torkelsen to leave the area, and Torkelsen complied with the request.

[¶ 3] When law enforcement officers arrived, Belzer told them about Torkelsen. A "be on the lookout" bulletin was issued for Torkelsen's pickup. While en route to the crime scene, North Dakota Bureau of Criminal Investigations Agent Craig Zachmeier saw a green Florida Marlins jacket in the middle of the road, but proceeded on to the crime scene. The jacket was located on a direct route from the crime scene to Cando. Zachmeier arrived at the crime scene around 10:30 a.m., but later went back to collect the jacket. He noticed blood on the jacket, which was later tested and confirmed as Flaa's blood.

[¶ 4] At approximately 1:26 p.m., Torkelsen's vehicle was stopped 28 miles west of Cando. Torkelsen was informed that he was wanted for questioning and would be handcuffed for his own safety. Torkelsen was transported to Cando, and his pickup was left at the scene of the stop.

[¶ 5] Torkelsen's handcuffs were removed upon his arrival at the Towner County Sheriff's Office. Zachmeier began interviewing Torkelsen at approximately 2:15 p.m., and the interview was videotaped. Zachmeier read Torkelsen his *Miranda* rights, and Torkelsen acknowledged he understood them. Zachmeier informed Torkelsen he was not under arrest, but was being detained for questioning because he was at the crime scene; however, Zachmeier did not tell Torkelsen he was free to leave. Zachmeier asked Torkelsen if he could talk to him about what happened that morning, and Torkelsen consented. Zachmeier asked Torkelsen what he saw when he ran into Belzer earlier that day, where he was staying, and what he had been doing. Torkelsen said he stayed at his parents' house in Cando the previous night, but went to his camper in the morning, and then watched a movie and slept. Zachmeier requested Torkelsen's consent to search his pickup and camper, and Torkelsen consented to a search of his camper twice and to a search of his pickup three times. Zachmeier requested Torkelsen's permission to photograph Torkelsen's hands, arms, back and legs, and Torkelsen consented. Zachmeier noticed an odor of alcohol on Torkelsen's breath, and tests showed he had a blood alcohol concentration of .003 percent. At approximately 3:00 p.m., Zachmeier read Torkelsen the written consent to search form, which included language about the right to refuse to consent to the search. Torkelsen signed consent forms for searches of the camper and pickup.

[¶ 6] At approximately 3:30 p.m., Torkelsen and law enforcement officers arrived at the camper, located on the Abrahamson farm. Torkelsen consented to the search again and showed officers how to unlock and enter the camper. Law enforcement officers found incriminating evidence in the camper, including tissue containing what appeared to be human blood; marijuana cigarette packs; rolling papers; papers with Flaa's name on them; a video cassette case with what appeared to be human blood on it; blood on a cupboard, cabinet doors, molding, and the ceiling; a bag containing makeup with the name Becky; a knife with a broken tip in the sink; cigarette and marijuana cigarette butts; and papers with Torkelsen's name on them. At approximately 5:00 p.m., before leaving the site of the camper search, Torkelsen again consented to a search of his pickup. Before going to Torkelsen's pickup, officers gave Torkelsen something to eat and drink, but denied his request to stop at his parents' house.

[¶ 7] At 6:20 p.m., the officers and Torkelsen arrived at the pickup for the search. Torkelsen consented to a search of the pickup again. The officers searched the pickup and found human hair; burnt fabric; a bloody bed sheet, which was later tested and confirmed as Flaa's blood; a

pillow case; a knife; a blanket with hairs on it; three .270 caliber rifle cartridges; nylon rope; and black plastic bags. The search was completed around 7:45 p.m., and Torkelsen was transported back to Cando for a second interview.

[¶ 8] At 6:30 p.m., Highway Patrol Trooper Robert Kennedy learned from another law enforcement officer that Torkelsen and Flaa had been staying together at the Abrahamson farm, owned by J.R. Gibbens. Kennedy visited with Gibbens and learned Gibbens had padlocked the farmhouse a week earlier to prevent Torkelsen and Flaa from using it. At 7:40 p.m., Gibbens signed a consent form allowing officers to search the farmhouse located on the Abrahamson farm. At 8:45 p.m., officers searched the farmhouse and outbuildings and found a document and a magazine with Torkelsen's name in the farmhouse, a clump of auburn hair similar to Flaa's in the bathroom garbage and a spot of blood in the living room.

[¶ 9] At 9:45 p.m., Torkelsen was interviewed a second time, and the interview was videotaped. Zachmeier read Torkelsen the *Miranda* warning again, and Torkelsen acknowledged he understood his rights. Torkelsen reviewed the consent to search forms and stated he did not have a problem with the searches of his camper and pickup. Zachmeier asked Torkelsen about the evidence found during the searches. Torkelsen said he was in a sexual relationship with Flaa. He said that she stayed with him in his camper on June 23, that he left the camper the next morning to go to his parents' house in Cando, but Flaa was not at the camper when he returned at 9:00 p.m. that night and that he thought she left to go back to her boyfriend. He said he stayed at his parents' house on June 25 and 26, but he left his parents' house at 6:00 a.m. on June 27 and returned to the camper where he slept until 8:30 a.m. He stated he was traveling back to Cando on a rural county road out of his way, when he saw Belzer and asked if he needed any help. He said that after he talked to Belzer, he returned to his parents' house, showered, changed his clothes, then left, after which law enforcement stopped his vehicle and took him into custody. Torkelsen also said he left a pair of work boots and a pair of tennis shoes at his parents' house. He gave a description of Flaa, which matched the body found in the ditch, and identified the green Florida Marlins jacket as Flaa's. Torkelsen claimed Flaa cut her lip and had a bloody nose to explain the blood found in the camper. At 10:05 p.m., Torkelsen consented to give a saliva sample for DNA. Torkelsen was formally arrested and taken to the Lake Region Correctional Center at approximately 11:30 p.m.

[¶ 10] At around 11:30 p.m., Zachmeier interviewed Torkelsen's parents, Art and Leona Torkelsen. They said Torkelsen had been with Flaa, he came to their home on June 24 to get candy and food for Flaa, but he told them she was gone when he returned to the camper. Art and Leona Torkelsen consented to a search of their house, but Art Torkelsen later revoked his consent. The officers left the house, but one officer came back to watch the house. Zachmeier applied for a search warrant by telephone and testified in support of the warrant. Zachmeier requested the warrant authorize a no-knock search and nighttime service. Zachmeier testified a nighttime search warrant was justified because they were investigating a serious offense, because he was concerned Torkelsen's parents may try to get rid of evidence to protect their son, and because Torkelsen's parents had posted a substantial bond for him before. A search warrant was issued at 2:28 a.m., authorizing a search of Art and Leona Torkelsen's home for controlled substances and items connected to the murder. The warrant in-

cluded no-knock and nighttime service provisions. The issuing magistrate authorized a nighttime search and said, "Based on the seriousness of the crime, and based on the unwillingness of the owners of the residence to help you in the search a night time service of this search warrant is authorized."

[¶ 11]   The officers executed the search warrant at 2:45 a.m., and Zachmeier did not participate in the search.   They knocked and rang the doorbell to wake Art and Leona Torkelsen and did not use the no-knock provision.   The officers seized boots located in the garage which were splattered with blood and had hair on the bottom, gas cans from the shed, and firearms.

[¶ 12]   On June 28, 2004, officers talked to a witness who saw Torkelsen pour gas into his pickup from a red gas can on the morning of June 27, in the alley behind his parents' house.   A second witness, one of Art and Leona Torkelsen's neighbors, reported seeing Torkelsen place a yellow woman's shirt in the witness's trash can on the morning of June 27.   Two other individuals reported seeing Torkelsen acting strangely as he unloaded items from his truck at his parents' house on June 27.

[¶ 13]   Later that afternoon, a second burn site was reported on a farm near a coulee bank.   The grass leading to the burn site was packed down by vehicle tire tracks, and officers later determined the tire tracks closely matched the measurements of Torkelsen's pickup.   Officers found a belt buckle, pants, luggage tag, and a cigarette butt.   The cigarette butt contained Torkelsen's DNA.   A dive search of the coulee was also completed, and officers found what appeared to be metal frames from a suitcase.   The next day, a piece of paper with Flaa's name was found nearby.

[¶ 14]   On June 30, 2004, officers interviewed a witness who stated that he thought Torkelsen had previously beaten Flaa badly and that Flaa had two dark colored suitcases when Torkelsen picked her up.   Officers received information from another witness on July 1, who reported seeing Torkelsen wash out his pickup at the car wash in Cando, at around 10:00 a.m. on June 27.

[¶ 15]   The body found burning in the ditch was identified as Flaa.   Authorities determined Flaa's death was caused by blunt force trauma to the head and by asphyxiation.   Torkelsen was charged with her murder.

[¶ 16]   Before trial, Torkelsen moved to dismiss or suppress the evidence on Fourth Amendment grounds.   The district court denied Torkelsen's motion, and he entered an *Alford* conditional guilty plea under *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and N.D.R.Crim.P. 11(a)(2), reserving the right to appeal.   Torkelsen appealed the criminal judgment, arguing the district court erred in denying his motion to suppress.   In *State v. Torkelsen,* 2006 ND 152, 718 N.W.2d 22, this Court reversed the criminal judgment, concluding the initial stop of Torkelsen's vehicle was illegal because at the time of the stop, the officers did not have a reasonable and articulable suspicion Torkelsen had engaged in criminal activity.

[¶ 17]   On remand, Torkelsen moved to suppress his videotaped interviews and the evidence found in the camper, pickup, and his parents' house, arguing the evidence was seized as a result of the illegal stop of his vehicle and, therefore, the evidence must be suppressed as "fruit of the poisonous tree."   The district court denied his motion and concluded the evidence was admissible because Torkelsen voluntarily consented to the searches of his person, camper, and truck; any taint of the illegal stop was purged;   there was probable

cause to issue a search warrant for Torkelsen's parents' home, but there was not probable cause for a nighttime search warrant; the nighttime search warrant did not satisfy the good-faith exception; the evidence found in the camper and Torkelsen's parents' house would have been inevitably discovered; and evidence from the camper and pickup would have been found in a search authorized by Torkelsen's probation officer.

[¶ 18]   Torkelsen attempted to play an active role in his defense, writing letters to the court, filing motions, and often interrupting proceedings if he thought something was not being done correctly. Previous court appointed attorneys withdrew their representation of Torkelsen. The attorney who represented him at trial, Thomas E. Merrick, also moved to withdraw as counsel. During the fifth day of trial, Torkelsen asked the court whether it would accept Merrick's motion to withdraw as counsel, and the court denied his request. The jury found Torkelsen guilty of murdering Flaa, and he was sentenced to life without parole.

## II

[¶ 19]   Torkelsen first claims the district court erred by failing to suppress evidence. When reviewing a decision on a motion to suppress, we recognize the court has an opportunity to observe the witnesses and to assess their credibility, and we defer to the court's findings of fact and resolve conflicts in testimony in favor of affirmance. *State v. Graf*, 2006 ND 196, ¶ 7, 721 N.W.2d 381. We will affirm the court's decision if " 'there is sufficient competent evidence fairly capable of supporting the [district] court's findings, and the decision is not contrary to the manifest weight of the evidence.' " *Id.* (quoting *City of Fargo v. Thompson*, 520 N.W.2d 578, 581 (N.D.1994)). Whether a finding of fact meets a legal standard is a question

of law, fully reviewable on appeal. *Graf*, at ¶ 7.

### A

[¶ 20]   Torkelsen argues the district court erred in failing to suppress the statements he made during the interviews with law enforcement and the evidence seized as a result of the statements he made during the interviews because the evidence and testimony was obtained as a result of the illegal stop of his vehicle and his illegal detention, and therefore the statements and evidence must be excluded as "fruit of the poisonous tree." He also contends his consents to the interview and the searches of his camper and pickup do not sufficiently purge the taint of the unlawful stop.

[¶ 21]   Under the Fourth Amendment of the United States Constitution and article 1, section 8 of the North Dakota Constitution, all searches and seizures must be reasonable. A warrantless search of a person's home is presumptively unreasonable, but a warrantless search may be reasonable if it falls under one of the exceptions to the warrant requirement. *Graf*, 2006 ND 196, ¶ 9, 721 N.W.2d 381. "Consent is one exception to the warrant requirement," but the consent must be voluntary and the State has the burden of proof. *Id.* at ¶¶ 9–10. Whether an individual voluntarily consented to a search is a question of fact that must be determined by looking at the totality of the circumstances. *Id.* at ¶ 10. " '[B]ecause the [district] court is in a superior position to judge credibility and weight, we show great deference to the [ ] court's determination of voluntariness.' " *State v. Genre*, 2006 ND 77, ¶ 30, 712 N.W.2d 624 (quoting *State v. Helmenstein*, 2000 ND 223, ¶ 18, 620 N.W.2d 581). "Consent is voluntary when it is the product of a free and unconstrained choice and not the product of

duress or coercion[,]" and to decide whether consent is voluntary we consider:

"(1) the characteristics and condition of the accused at the time of the consent, including age, sex, race, education level, physical or mental condition, and prior experience with police; and (2) the details of the setting in which the consent was obtained, including the duration and conditions of detention, police attitude toward the defendant, and the diverse pressures that sap the accused's powers of resistance or self control."

*Id.* at ¶ 31 (quoting *State v. Haibeck,* 2004 ND 163, ¶ 21, 685 N.W.2d 512).

[¶ 22] The district court provided a thorough and detailed analysis of whether the evidence from the searches of the camper and pickup and Torkelsen's interviews with law enforcement was admissible. The court found Torkelsen voluntarily consented to the searches based on the totality of the circumstances. The court considered Torkelsen's characteristics and his condition, including his age and education, his extensive experience with law enforcement, his *Miranda* rights were given and his acknowledgment and understanding of them, his use of a very small amount of alcohol, his lack of intimidation, and his cooperativeness. The court concluded these factors weighed in favor of consent. The court also considered the setting in which the consent was obtained, including that Torkelsen dealt with different officers throughout the night; no evidence existed that law enforcement exerted intimidation or made promises to Torkelsen; Torkelsen was told he was not under arrest during the first interview, but he was not told he was free to leave; the first interview was conversational; Torkelsen was cooperative and consented to the officers' requests; officers gave Torkelsen food and water; officers asked for Torkelsen's consent multiple times, and Torkelsen gave consent at each request; and the second interview was focused on evidence found during the searches, but Torkelsen remained calm and cooperative and was not intimidated. The court also found that there were no grounds for any claims of officer misconduct during the interviews or that the officers were unreasonably coercive in attempting to get Torkelsen to cooperate with them. Based upon its detailed analysis, the court found Torkelsen voluntarily agreed to the interviews and his consent for the searches was voluntary based on the totality of the circumstances. We conclude there is sufficient competent evidence supporting the court's findings and the court's decision is not contrary to the manifest weight of the evidence.

[¶ 23] Although Torkelsen voluntarily consented to the interviews and searches of his camper and pickup, the inquiry does not end there because, according to our prior decision, the consent was preceded by illegal police action. Generally, evidence unlawfully seized in violation of the Fourth Amendment must be suppressed under the exclusionary rule. *State v. Utvick,* 2004 ND 36, ¶ 26, 675 N.W.2d 387. "Any evidence obtained as a result of illegally acquired evidence must [also] be suppressed as 'fruit of the poisonous tree'...." *State v. Gregg,* 2000 ND 154, ¶ 39, 615 N.W.2d 515. However, evidence characterized as fruit of the poisonous tree may still be admitted if "it was not produced by exploiting the illegally acquired information." *Id.* "This 'unpoisoning' of the fruit may be achieved by the State through the use of the 'independent-source exception,' the 'inevitable-discovery exception,' or the 'attenuation exception' to the exclusionary rule." *Id.* at ¶ 40.

[¶ 24] Under the attenuation exception, the challenged evidence should only be excluded if it is the product of illegal government activity. Evidence "is

not the fruit of a poisonous tree simply because it would not have come to light without the illegal action of the police; rather, the proper inquiry is whether the evidence was obtained by exploitation of the illegal action or by means sufficiently distinguishable to purge the evidence of the primary taint." *Gregg*, 2000 ND 154, ¶ 41, 615 N.W.2d 515. A defendant's act of free will may purge the primary taint of an illegal stop; however, " 'voluntary consent to a search, preceded by an illegal police action, does not automatically purge the taint of an illegal detention.' " *State v. Smith*, 2005 ND 21, ¶ 26, 691 N.W.2d 203 (quoting *United States v. Becker*, 333 F.3d 858, 862 (8th Cir.2003)). The consent must be voluntary, but we must also consider the following factors to determine whether the taint was purged from the evidence seized: " '(1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.' " *Smith*, at ¶ 26 (quoting *Becker*, 333 F.3d at 862). The evidence seized in the search will still be the fruit of the poisonous tree if the consent does not purge the evidence of the taint of the unlawful police activity. *Smith*, at ¶ 26.

[¶ 25] The district court applied the three factors from *Smith* and concluded the voluntary consent purged the taint of the illegal stop. The court found that the temporal proximity was rather short because the time between the stop and oral consent was about one hour, that the time between the stop and the written consent was about an hour and a half, that Torkelsen was not free to leave and that he was not informed he could refuse the consent until the written consent was presented. However, the court said temporal proximity must not be considered alone, and the other factors favored finding the consent purged the taint of the illegal stop. The court found intervening circumstances ex-

isted, including: the 20 to 30–minute ride to Cando without interrogation, the arrival of a new officer who removed Torkelsen's cuffs and had not detained Torkelsen, the lengthy periods of time he spent alone in the interview room, the *Miranda* warnings given, his consent to photographs of his body, the administration of alcohol testing by a different officer, and his awareness that he must submit his place of residence and vehicle to search at any time by his probation officer with or without a search warrant. The court concluded these factors could be considered intervening circumstances breaking the chain of events leading from the illegal stop to the consent for the searches. The court said the third and most important factor was the purpose and flagrancy of the official misconduct. In this case there was an absence of flagrant misconduct. The court found the officers' misconduct in unlawfully stopping Torkelsen's vehicle was not flagrant because there was no evidence of officer abuse or intimidation, no evidence of physical or mental harm, and no evidence the officers acted knowing the stop was illegal or improper. Although the court stated this was a close case, it concluded the taint of the illegal stop was purged and the evidence from the searches and evidence collected during Torkelsen's interviews with law enforcement should not be suppressed.

[¶ 26] In this case, there is a short period of time between the illegal stop and the consent. However, the consent may be sufficient to purge the taint even with only a short time between the consent and the illegal police action if other circumstances indicate the consent was sufficiently an act of free will. *See, e.g., United States v. Esquivel*, 507 F.3d 1154, 1160 (8th Cir.2007) (consent was an act of free will and sufficiently purged the taint when consent was given approximately nine minutes after the defendant's detention ceased

being valid because there were other intervening circumstances and no official misconduct). Torkelsen's vehicle was stopped at 1:26 p.m. Torkelsen's first interview with police began at approximately 2:15 p.m., he consented to the searches of his pickup and camper during the interview, and he gave written consent at approximately 3:00 p.m. Torkelsen gave consent for the searches forty-five minutes to an hour and a half after the illegal stop, and he was detained during this time. Although the temporal proximity is short, the other factors indicate the consent was sufficiently an act of free will.

[¶ 27] Intervening circumstances can include telling a suspect he may refuse to consent to a search, advising the suspect of his *Miranda* rights, or changing the location with a new officer questioning the defendant when he is relaxed and composed. *See Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (*Miranda* warning alone may not break the taint, but it is a factor); *United States v. Stark*, 499 F.3d 72, 77 (1st Cir. 2007) (interrogation by a new officer in a new location when defendant is relaxed and composed is a significant intervening event); *Becker*, 333 F.3d at 862 (informing defendant of right to refuse to consent is an intervening event). Torkelsen had been read his *Miranda* rights, was told he was not under arrest, was informed he could refuse to consent to the searches, had been transported to a different location from where the unlawful police conduct occurred, was questioned by a different officer, and was relaxed, cooperative and complied with the officer's requests. We conclude these facts constitute sufficient intervening circumstances.

[¶ 28] Some courts have concluded the purpose and flagrancy of the official misconduct is the most important factor " 'because it is tied directly to the rationale underlying the exclusionary rule, deter-

rence of police misconduct.' " *See Stark*, 499 F.3d at 77 (quoting *United States v. Reed*, 349 F.3d 457, 464–65 (7th Cir.2003)). Some courts consider "whether [ ] the police used threatening or abusive tactics [and whether] [ ] the impropriety of the initial misconduct was obvious." *Stark*, 499 F.3d at 77. Here, law enforcement did not use coercive or abusive tactics, and the stop of Torkelsen's vehicle was not an obvious legal error. The district court found there was an absence of flagrant misconduct and there was no evidence the officers knew the stop was illegal. The evidence supports the court's findings.

[¶ 29] The evidence supports the district court's findings that Torkelsen voluntarily consented to the interview and searches, and we conclude Torkelsen's voluntary consent was an independent cause of the discovery of the challenged evidence and purged the taint of the illegal stop. The district court did not err in admitting the evidence seized during the searches and Torkelsen's statements to law enforcement.

B

[¶ 30] Torkelsen contends the district court erred in admitting the evidence seized during the nighttime search of his parents' house. He claims the evidence should have been suppressed because there was not separate probable cause to justify authorizing a nighttime search and the court erred in applying the inevitable discovery doctrine after concluding there was not probable cause for the nighttime search and the good-faith exception did not apply.

[¶ 31] "An individual is only entitled to the protection of the exclusionary rule [and to challenge a search] if the individual's own Fourth Amendment rights were violated and not the rights of a third party." *State v. Oien*, 2006 ND 138, ¶ 8,

717 N.W.2d 593. An individual is entitled to claim the protections of the exclusionary rule if he has a reasonable expectation of privacy in the place searched. *Id.* "A guest generally has a reasonable expectation of privacy in the [host's home]." *Id.* at ¶ 9. Torkelsen was at least a guest in his parents' house. He often slept at his parents' house and kept some of his belongings there. Torkelsen had a reasonable expectation of privacy in his parents' house and, therefore, may challenge the search.

[¶ 32] Torkelsen concedes there was probable cause to issue a search warrant for his parents' house, but argues there was not separate probable cause to issue a warrant for a nighttime search. Under N.D.R.Crim.P. 41(c)(1)(E), a warrant must be served in the daytime, "unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." This Court has said reasonable cause for a nighttime search requires a separate showing of probable cause. *State v. Fields,* 2005 ND 15, ¶ 9, 691 N.W.2d 233. The purpose of the rule " 'is to protect citizens from being subjected to the trauma of unwarranted nighttime searches. Courts have long recognized that nighttime searches constitute greater intrusions on privacy than do daytime searches.' " *Id.* (quoting *State v. Schmeets,* 278 N.W.2d 401, 410 (N.D. 1979)). "Necessity for a nighttime search exists 'where there is a reasonable possibility that the fruits, instrumentalities or evidence of crime sought would not be expected to be at the searched premises during the day or might be removed or dissipated if the search is delayed.' " *See Roth v. State,* 2007 ND 112, ¶ 22, 735 N.W.2d 882 (quoting *State v. Richardson,* 80 Hawai'i 1, 904 P.2d 886, 890 (1995)). The focus of a court's decision whether to grant a request for a nighttime search must be upon the necessity for executing the warrant at a time other than the daytime. *Roth,* at ¶ 22. There are many circumstances under which there would be probable cause for a nighttime search, including when there is a showing that evidence sought may be quickly and easily disposed of. *Fields,* at ¶ 10. However, there must be some basis for believing the evidence will be destroyed without a nighttime search other than the fact the evidence exists. *Id.*

[¶ 33] In this case, Zachmeier applied for a search warrant and requested authorization for a nighttime search because "what we are investigating here is a serious crime—a justification can get rid of evidence. That parents can protect their kids and that might happen, and then the Torkelsens have on occasion posted substantial bonds for Steve Torkelsen to get him out of jail in the past. So, I would request a nighttime search warrant." The issuing magistrate authorized a nighttime search and concluded probable cause existed because of the seriousness of the crime, because of the information that Torkelsen's parents might destroy evidence, and because of the homeowners' withdrawal of their earlier consent to a search.

[¶ 34] Acting on Torkelsen's motion to suppress, the district court concluded there was not probable cause to authorize a nighttime search:

> "While the crime is serious, this court can find no case law which permits a nighttime search based upon seriousness of the crime. The officer also stated that a parent may destroy evidence to protect a child. There are no facts presented in this case to suggest that the Torkelsens had done so or would do so for their son. How could they destroy firearms, clothing, boots, and gas cans. The officer testified that he had no idea how the evidence would be destroyed and there was no mention that the items

would be washed or cleaned by the parents.

"The vague history of posting a bond for their son does not justify a nighttime warrant. The parents were law abiding, elderly citizens and it is absurd to conclude that they would remove or destroy evidence based upon the death investigation. While they were aware that the Defendant had been charged with two drug offenses, he had not been charged with the death of the unidentified body. Based upon the hearing transcript, Agent Zachmeier did not meet the burden necessary to demonstrate the need for a nighttime warrant. On this record, there is no evidence to support the finding of probable cause for a nighttime warrant."

[¶ 35] After concluding probable cause did not exist to issue a nighttime warrant, the district court considered whether the evidence must be suppressed or whether one of the exceptions to the exclusionary rule applied. The court considered both the good-faith exception and the inevitable discovery doctrine. The court concluded the good-faith exception did not apply because a reasonably well-trained officer would have known the nighttime warrant was deficient because it was based on clearly insufficient and inadequate reasons and would not have relied on it in executing the nighttime search. However, the court also concluded the evidence seized in the search of the parents' residence was admissible under the inevitable discovery doctrine because the officers did not act in bad faith to accelerate the discovery of evidence and because the evidence would have inevitably been discovered based on the information law enforcement had about Torkelsen's activities at his parents' house, including the statements from witnesses about Torkelsen's activities in the garage and alley areas of his parents' residence.

[¶ 36] We agree with the district court that the evidence seized during the search of the parents' house should not be suppressed; however, we conclude the court reached the correct result for the incorrect reason. *See Roth*, 2007 ND 112, ¶ 17, 735 N.W.2d 882. In reviewing probable cause determinations, doubtful or marginal cases are resolved in favor of the magistrate's decision. *Id.* at ¶ 18. Although this is a close case, we conclude the district court erred in concluding there was not reasonable cause for a nighttime search.

[¶ 37] In *United States v. Searp*, 586 F.2d 1117 (6th Cir.1978), the defendant was a suspect in a robbery and officers searched his mother's house, where he frequently stayed. The officers were aware the defendant was not at the house because he had fled the state, and the defendant's mother refused to consent to the search. *Id.* at 1119. The police applied for a warrant, and the warrant was issued at 11:27 p.m. and was promptly executed. *Id.* Although officers did not request the warrant allow a nighttime search, the court said any judicial officer would have authorized a night search under the circumstances if one had been requested because the defendant's mother knew the police wanted to search her home to find evidence of a crime committed by her son and only an immediate search could prevent the possible destruction of the evidence sought. *Id.* at 1122. The court concluded there would have been reasonable cause to issue a nighttime warrant because there was "some factual basis for a prudent conclusion that the greater intrusiveness of a nighttime search is justified by the exigencies of the situation." *Id.* at 1121–22.

[¶ 38] In this case, there was reasonable cause for a nighttime search because there was a reasonable probability that the evidence sought would no longer be at the

Torkelsens' house if the search was delayed. After Torkelsen's camper and pickup had been searched and he was taken into custody, law enforcement interviewed Torkelsen's parents. During the interview, law enforcement informed Torkelsen's parents he had been arrested, a body matching Flaa's description was found burning in a ditch near Torkelsen's camper, Flaa had been staying with Torkelsen, a witness saw Torkelsen near the crime scene before law enforcement arrived, law enforcement was investigating whether Torkelsen was connected to the homicide although he had not been arrested for the murder yet, Torkelsen consented to searches of his camper and pickup, blood was found in the camper, Torkelsen said he had been at his parents house earlier in the day, and he said he had changed clothes at his parents' house and left a pair of shoes there. Law enforcement requested Torkelsen's parents' consent to search their residence, and told Torkelsen's parents they would like to search the residence for Torkelsen's clothing, his shoes, items Torkelsen may have thrown in the garbage, and anything else that may connect Torkelsen to the homicide. Torkelsen's parents consented to a search of their house, and law enforcement began the search, but Arthur Torkelsen later revoked his consent before officers had finished the search. Zachmeier requested a nighttime warrant because he was concerned Torkelsen's parents might try to destroy evidence to protect their son. As the court concluded in *Searp*, 586 F.2d at 1122, it is reasonable to believe that parents who know law enforcement want to search their home for evidence of a crime their child may have committed could destroy possible evidence and a nighttime search may be necessary to prevent the destruction of that evidence. Torkelsen's parents were aware their son was being investigated for committing a murder, they knew law enforcement believed there could

be possible evidence in their house connecting their son to the murder, they knew what type of evidence law enforcement sought, and Arthur Torkelsen revoked his consent to search the house after a search had commenced. Although the house was placed under surveillance, an immediate search was the only way to prevent the possible destruction of evidence. Under these circumstances, there was a reasonable possibility that the evidence sought would not be in the Torkelsen's residence or would be destroyed if the search was delayed, and therefore there was reasonable cause for a nighttime search.

[¶ 39] We conclude there was reasonable cause for a nighttime search and the district court did not err in allowing the admission of the evidence seized during the search of Torkelsen's parents' home. Because we conclude there was reasonable cause for the nighttime search, we do not need to consider whether the inevitable discovery doctrine would apply.

III

[¶ 40] Torkelsen argues the district court denied his constitutional right to represent himself. He contends that his request for the court to accept his attorney's motion to withdraw as counsel and to allow him to ask the witnesses questions was a request to represent himself and that the court was required to inquire about his request and make findings about the basis of its denial.

[¶ 41] We review claims that a defendant's constitutional rights were violated de novo. *State v. Ochoa*, 2004 ND 43, ¶ 15, 675 N.W.2d 161. A defendant has a right to counsel under the Sixth Amendment of the United States Constitution, and article I, section 12 of the North Dakota Constitution. *Id.* A defendant also has an implied right to represent himself under the Sixth Amendment. *Id.*; *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct.

2525, 45 L.Ed.2d 562 (1975). "Generally, the defendant must make a 'knowing, intelligent, voluntary, and unequivocal request before a court may conclude he has waived his right to counsel and invoked his right to represent himself.'" *Ochoa,* at ¶ 16 (quoting *Hamilton v. Groose,* 28 F.3d 859, 862 (8th Cir.1994)). In order to represent himself, a defendant must "knowingly and intelligently" forgo the benefits associated with the right to counsel and "should be made aware of the dangers and disadvantages of self-representation." *Faretta,* at 835, 95 S.Ct. 2525.

[¶ 42] The request for self-representation must be clear and unequivocal. *See United States v. Edelmann,* 458 F.3d 791, 808 (8th Cir.2006); *Reese v. Nix,* 942 F.2d 1276, 1280 (8th Cir.1991). Asserting the right to self-representation is a waiver of the right to counsel; therefore the defendant must clearly and unequivocally assert the right and must knowingly and intelligently choose self-representation. *See Reese,* at 1280. A defendant's statement that he would rather represent himself may be equivocal if it is made in response to a court's denial of a request for change in counsel, because it may be an impulsive, emotional response rather than clear and unequivocal invocation of the right to self-representation. *Id.* at 1281. This Court has said a request does not necessarily have to be unequivocal, but only when the defendant's conduct rises to the level of a functional equivalent of a voluntary waiver. *See State v. Fischer,* 2008 ND 32, ¶¶ 21–23, 744 N.W.2d 760; *State v. Holbach,* 2007 ND 114, ¶ 11, 735 N.W.2d 862; *State v. Dvorak,* 2000 ND 6, ¶ 15, 604 N.W.2d 445 (pattern of obstructing the legal process); *State v. Harmon,* 1997 ND 233, ¶¶ 20–21, 575 N.W.2d 635 (continued requests for substitute counsel after having previous requests denied). "'Courts should indulge every reasonable presumption against waiver[,]'" and any ambiguity should be resolved against a

conclusion that the defendant waived his right to counsel and invoked his right to self-representation. *Ochoa,* 2004 ND 43, ¶ 18, 675 N.W.2d 161 (quoting *State v. Kranz,* 353 N.W.2d 748, 752 (N.D.1984)). Whether a defendant has waived his right to counsel and asserted the right to represent himself "depends upon the facts and circumstances of each particular case, including the background, the experience, and the conduct of the accused." *Ochoa,* at ¶ 16.

[¶ 43] Furthermore, the request must be timely, the defendant cannot use self-representation to disrupt and delay the proceedings, and the defendant must be able to knowingly and intelligently forgo the benefits associated with the right to counsel. *Edelmann,* 458 F.3d at 808. The right to self-representation is unqualified only if it is demanded before trial. *See United States v. Young,* 287 F.3d 1352, 1354 (11th Cir.2002); *United States v. Wesley,* 798 F.2d 1155 (8th Cir.1986). If the request for self-representation is not timely because it is made after the trial begins, it is within the court's discretion to grant the request; however, the court must balance the defendant's interests and the potential disruption and delay, and the court's decision will not be reversed on appeal unless the court abused its discretion. *Wesley,* at 1156.

[¶ 44] In this case, Torkelsen's attorney moved to withdraw as counsel prior to trial, but Torkelsen did not request to represent himself prior to trial. Torkelsen claims he requested the right to represent himself on the fifth day of trial, during a discussion about Torkelsen's defense strategy:

"THE COURT: Okay. Is there—Mr. Merrick, are there any other additional questions at this time that you wish to ask Mr. Causer or Mr. Steen or Mr. Keeney.

MR. MERRICK: No, Your Honor.

THE COURT: Okay.

THE DEFENDANT: Excuse me, Your Honor. If they don't, I—I believe you haven't ruled on his motion to withdraw as counsel. That's still under advisement for the last six months.

THE COURT: Right.

THE DEFENDANT: I ask that now you do accept his motion to withdraw as counsel.

THE COURT: You're really asking me to let your attorneys go—

THE DEFENDANT: These questions—he's trying to tell you, he asks—he just asked you now when you asked him again, he said I don't—he admits that Steen in one statement says in the law library and in another statement says in the cafeteria.

Well, in fact it wasn't in the law library. It was in the—he says—Mr. Merrick says what is the significance of that. Well, the significance is he's changing his story repeatedly. You'd think they'd have gotten one story and stuck with it, Your Honor. And I—I insist that either I alone sit here and be allowed to ask these questions so I'm not tugging on his sleeve and being ignored.

He said he wonders what the significance of asking Causer what this—if there's any significance between Causer one story one or two or three miles, six or eight or ten minutes and—or 12 or—12 miles—odd miles back to Cando to wash his pickup.

Now, either he's going to ask him or I—or I'll sit here and ask him. It will take me longer in between questions, but at least I'll—there will be some thought put into each question.

THE COURT: Your request for counsel to be dismissed based on the motion—

THE DEFENDANT: I—

THE COURT:—is denied. Counsel will continue to address the witnesses in the court in representing the defendant. And, Mr. Torkelsen, you—the same behavioral rules that I set forth yesterday will apply."

[¶ 45] Torkelsen claims the district court erred in denying his request without inquiring whether he was waiving his right to counsel and without making any findings of fact about the basis of the denial. Torkelsen's alleged waiver of his right to counsel and request to represent himself was equivocal. Torkelsen's request must be viewed within the context of the situation. Torkelsen disagreed with how his attorney was questioning certain witnesses and his attorney's trial strategy. Torkelsen's request was an impulsive, emotional response to his frustration with his attorney, rather than a clear and unequivocal invocation of the right to self-representation. *See Reese*, 942 F.2d at 1281. "[M]ore than an equivocal request for self-representation [is required] before [a court is obligated to] engage in a full-blown *Faretta* inquiry." *Ochoa*, 2004 ND 43, ¶ 30, 675 N.W.2d 161. We conclude Torkelsen's request was not an unequivocal request to represent himself, and therefore the court was not required to inquire into Torkelsen's wishes and did not abuse its discretion in denying his request. Torkelsen's right to self-representation was not violated.

IV

[¶ 46] We conclude the district court did not err in denying Torkelsen's motion to suppress the evidence seized during the searches of his camper, pickup, and parents' house. We also conclude Torkelsen's constitutional right to represent himself was not violated. We therefore affirm Torkelsen's conviction.

[¶ 47] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING and CAROL RONNING KAPSNER, JJ., concur.

SANDSTROM, Justice, concurring in the result.

[¶ 48] This trial should never have been held. Steven Torkelsen's original judgment of conviction should have been affirmed.

[¶ 49] The majority ruled that there was no reasonable suspicion to justify the stop of Torkelsen's vehicle. Reasonable suspicion is a minimal burden easily satisfied in the record. *See State v. Robertsdahl*, 512 N.W.2d 427, 428 (N.D.1994) (The Fourth Amendment requires "some minimal level of objective justification" for making the stop. *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)). The reasonable suspicion fully explained in my dissenting opinion in *State v. Torkelsen*, 2006 ND 152, ¶¶ 20–37, 718 N.W.2d 22, is summarized here:

Torkelsen was seen at the crime scene shortly after an apparent homicide. He did not seem surprised by the sight of a burning body. He had a known history of violence and threatened violence. He failed to yield to approaching emergency vehicles. He was leaving the community where the crime had apparently been committed under circumstances that suggested flight. These factors taken together provided the officers with a reasonable suspicion to stop Torkelsen for questioning about an apparent homicide.

*Id.* at ¶ 37 (Sandstrom, J., dissenting).

[¶ 50] Dale V. Sandstrom